**OAK DISTRIBUTING CO. et al.,
Plaintiffs,**

v.

**MILLER BREWING COMPANY,
Defendant.**

**Civ. A. No. 39717.**

United States District Court,
E. D. Michigan, S. D.

Nov. 30, 1973.

John L. Cote, Willingham, Coté, Hanslovsky, Griffith & Foresman, P. C., East Lansing, Mich., for plaintiffs.

John A. Krsul, Jr., Dickinson, Wright, McKean & Cudlip, Detroit, Mich., for defendant.

## ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

KAESS, Chief Judge.

This civil action has been brought pursuant to Section 4 of the Clayton Act (15 U.S.C. § 15) to recover treble damages for alleged violations of Sections 1 and 2 of the Sherman Act (15 U.S.C. §§ 1, 2), and the Clayton Act (15 U.S.C. § 12 et seq.). Plaintiffs have also included a count in their complaint, as amended, for breach of contract, and have also alleged violations of the Federal Alcohol Administration Act and unspecified laws of the State of Michigan.

Defendant Miller Brewing Company ("Miller") has brought this motion to dismiss pursuant to Rule 12, Federal Rules of Civil Procedure. However, the Court now considers this a motion for summary judgment pursuant to Rule 56, Federal Rules of Civil Procedure.

Miller is a corporation organized and existing under the laws of the State of Wisconsin, and has its principal place of business in Milwaukee, Wisconsin.

The Plaintiffs, Oak Distributing Company, Greater Macomb Beer and Wine Distributors, Ecko Beer Distributing and Supply, Inc., and Kolb Sales Co., are corporations organized pursuant to the laws of the State of Michigan, with their principal offices located, respectively, in the Counties of Oakland, Macomb, and Wayne, State of Michigan.

On June 29, 1972, Miller entered into an agreement with Meister Brau, Inc., a Delaware corporation. Under the said agreement, Miller purchased certain of the assets of Meister Brau, Inc. The relevant portions of that agreement provide:

"D. From the date of closing through December 31, 1973, Buyer

shall market beer under the Meister Brau, Buckeye and Lite brands. Except as provided in the previous sentence of this subparagraph, nothing in this Agreement shall require Buyer actually to brew or package any of the brands of beer subject to this Agreement, nor to package any such beer in any particular packages, nor to sell the same in any particular markets or to any particular persons, firms, or corporations. Pricing shall be in the sole discretion of the Buyer. All advertising, merchandising, promotion, and marketing themes and programs, as well as the extent thereof in respect of such brands, shall be in the sole discretion of Buyer subject only to the dollar limitations set forth in subparagraph C.

E. Except as provided in subparagraphs C and D above, nothing in this Agreement shall require Buyer to market any of the brands subject to this Agreement; or, to do so through particular wholesalers, distributors or retailers; or, to maintain any branches (including those heretofore operated by Seller) for that purpose. Buyer does not and under no circumstances shall Buyer become obligated to assume any of the obligations of Seller under any of the distributorship agreements Seller may have had with any of Seller's distributors. Sales by Buyer to such distributors shall not be regarded as an assumption of any such obligations. It is contemplated that Buyer is to be free to distribute the brands of beer subject to this Agreement through distributors of Buyer's selection."

Miller thereafter sent a letter dated June 30, 1972, to each of the 36 distributors of Meister Brau, Inc., including the plaintiffs, informing them of the non-assumption of Meister Brau, Inc.'s obligations by Miller. This letter also offered each distributor an opportunity to sell Miller beer, under an arrangement which could be terminated by either party at any time.

Of the thirty-six (36) distributors who were sent such a letter, eighteen (18) of those who accepted Miller's offer by returning the letter continue to this day to sell Miller beer. Eight (8) did not return the letter and, therefore, had no relationship with Miller. The remaining ten (10) who accepted Miller's offer by returning the letter were subsequently terminated by Miller as distributors, including the plaintiffs here, who were each terminated by notice dated September 22, 1972. Miller replaced the terminated distributors with other distributors who were properly licensed to distribute beer in Michigan (Dunn affidavit). As stated before, plaintiffs accepted Miller's offer, and continued to distribute the brands of beer previously supplied by Meister Brau until they were terminated by Miller on September 22, 1972.

Miller's share of the beer market in Michigan was 2.05% in 1971 and 2.51% in 1972. Based upon such percentages, Miller was the 11th ranking beer company in Michigan in terms of beer shipments in 1971 and the 9th ranking company in Michigan in terms of beer shipments in 1972 (Dunn affidavit).

In Count III of their amended complaint, plaintiffs allege that Miller has violated Section 1 of the Sherman Act. The alleged violations appear at III(2) as follows:

"(2) That commencing in the year 1972, and continuing up to and including the date of this Complaint, Miller has failed and refused to lawfully perform its obligations incumbent upon said corporation pursuant to Miller's acquisition from Meister Brau, Inc., of the trademarks Meister Brau, Lite and Buckeye, and has breached said contractual obligations in material respects including, but not limited to, those recited herebelow:

(A) combined, conspired and attempted to destroy the business of the said Distributors in interstate commerce;

(B) entered into and performed contracts, agreements and understandings in unreasonable restraint of interstate trade and commerce;

(C) combined, conspired and attempted to interfere, upset and destroy contractual and other advantageous relationships between said Distributors and others;

(D) combined, conspired and attempted maliciously to disparage said Distributors, and has so disparaged said Distributors in their trade and commerce;

(E) combined, conspired and attempted and has prevented said Distributors from selling and distributing beer products bearing Meister Brau, Lite and Buckeye trademarks with the intentions to substantially lessen competition and to create a monopoly in interstate commerce, and to wrongfully advance the competitive position of newly assigned distributors."

The law is clear that the allegations put forth by plaintiffs in no way constitute a violation of the antitrust laws, particularly Section 1 of the Sherman Act.

 In essence, plaintiffs allege that Miller terminated its contractual relationships with them in favor of contractual relationships with other distributors. This is readily admitted by Miller. Plaintiffs further allege a refusal to deal by Miller. This is also admitted. Nevertheless, it is clear that such conduct by Miller is not forbidden by the antitrust laws.

In United States v. Colgate Co., 250 U.S. 300 at p. 307, 39 S.Ct. 465 at p. 468, 63 L.Ed. 992 (1919), the United States Supreme Court held:

"In the absence of any purpose to create or maintain a monopoly, the [Sherman] act does not restrict the long recognized right of trader or manufacturer engaged in an entirely private business, freely to exercise his own independent discretion as to parties with whom he will deal."

In Ace Beer Distributors, Inc. v. Kohn, Inc., 318 F.2d 283 (6th Cir. 1963), cert. den. 375 U.S. 922, 84 S.Ct. 267, 11 L.Ed.2d 166 (1963), the complainant alleged that the defendants conspired to destroy plaintiff's business and to eliminate it as a beer distributor in interstate commerce, and "that this result was accomplished by the termination by Stroh of plaintiff's franchise as its beer distributor and thereafter conducting its business through another distributor" (318 F.2d at 286). In affirming the dismissal of plaintiff's complaint in which violations of Section 1 of the Sherman Act were alleged, the court held, at p. 286, as follows:

"That, without the results proscribed by the Sherman Act, is not a violation of the Act. A manufacturer has a right to select its customers and to refuse to sell its goods to anyone, for reasons sufficient to itself. United States v. Colgate Co., 250 U.S. 300, 39 S.Ct. 465, 63 L.Ed. 992. . . . A refusal to deal becomes illegal under the Act only when it produces an unreasonable restraint of trade, such as price fixing, elimination of competition or the creation of a monopoly. (Cases omitted). The fact that a refusal to deal with a particular buyer without more, may have an adverse effect upon the buyer's business does not make the refusal to deal a violation of the Sherman Act. Damage alone does not constitute liability under the Act.

\* \* \* \* \* \*

It is well settled that the 'restraint of trade' referred to in Section 1 of the Act, means only unreasonable restraint of trade, in that, as the cases point out, every commercial contract has some restraining effect upon trade. (Citing cases). *The substitution of one distributor for another in a competitive market of the kind herein involved does not eliminate or materially diminish the existing competition of distributors of other beers, is not an unusual business procedure,*

*and, in our opinion, is not an unreasonable restraint of trade.* (Citing cases)." (Emphasis added).

The Court notes that each of the plaintiffs have spiced their affidavits with a short and vary vague allegation of price fixing. However, nothing specific has been submitted which would support these naked allegations.

In Ricchetti v. Meister Brau, Inc., 431 F.2d 1211 (9th Cir. 1970), cert. den. 401 U.S. 939, 91 S.Ct. 934, 28 L.Ed.2d 219 (1971), Meister Brau, Inc. had purchased the assets of the Burgermeister Brewing Company, and thereafter determined not to appoint as distributors of Burgermeister Beer the three wholesale beer distributors who were appellants in the case. Other distributors, including some who had not previously handled Burgermeister Beer, were appointed to assume territories served by the terminated distributors. The three terminated distributors thereupon brought suit to enjoin the termination. The District Court refused an injunction, and the Ninth Circuit affirmed, holding at pp. 1214–1215:

> "It is well established that a manufacturer or producer has the right to deal with whom he pleases and to select his customers at will, so long as there is no resultant effect which is violative of the antitrust laws. Thus, a manufacturer may discontinue a relationship, or refuse to open a new relationship for business reasons which are sufficient to the manufacturer, and adverse effect on the business of the distributor is immateral in the absence of any arrangement restraining trade or competition. (Cases omitted). In United States v. Arnold Schwinn & Co., . . . [388 U.S. 365 at 376, 87 S.Ct. 1856, 18 L.Ed.2d 1249 (1967)], the Supreme Court set out the rule, with its limitations, that the manufacturer has a right to choose his dealers:
>
> 'At the other extreme, a manufacturer of a product other and equivalent brands of which are readily available in the market may select his customers, and for this purpose he may "franchise" certain dealers to whom alone, he will sell his goods. Cf. United States v. Colgate & Co., 250 U.S. 300, 39 S.Ct. 465, 63 L.Ed. 992 (1919). If the restraint stops at that point—if nothing more is involved than vertical "confinement" of the manufacturer's own sales of the merchandise to selected dealers, and if competitive products are readily available to others, the restriction, on these facts alone, would not violate the Sherman Act.'
>
> This court has previously held that a manufacturer or supplier has a legitimate interest in the quality, competence and stability of his distributor, and, if dissatisfied with a distributor, may properly sell his product to a more viable competitor. Joseph E. Seagram & Sons, Inc. v. Hawaiian Oke & Liquors, Ltd. [416 F.2d 71 (9th Cir. 1969)]. Where, as here, a supplier seeks no more than a better equipped and more aggressive distributor for his product, his conduct may in fact be more beneficial than detrimental to competition, and is not condemned by either the Sherman or Clayton Acts. As the antitrust laws do not prohibit a business from fairly entering into a competitive market, neither do they prohibit its improvement of its competitive stature in the product market."

Plaintiffs claim that their complaint should not be dismissed because they have alleged that Miller terminated the contracts with an intent to "create or maintain a monopoly". However, plaintiffs have not presented any facts which would tend to establish these allegations.

In First National Bank of Arizona v. Cities Service Co., 391 U.S. 253, 88 S.Ct. 1575, 20 L.Ed.2d 569 (1968), the Supreme Court made it clear that allegations of restraint of trade must be supported by significant probative evidence in order to overcome a motion for summary judgment. Plaintiff in that case,

represented by his executor, had acquired a contractual right to import Iranian oil after the government of that country had nationalized its wells. He negotiated with Cities Service concerning the purchase of crude oil, but after indicating some initial interest, Cities apparently changed its mind. Plaintiff sued, alleging that Cities and seven other oil companies had conspired to boycott plaintiff's oil. Eventually, Cities filed a motion for summary judgment with supporting affidavits. The motion was granted, and plaintiff appealed. The Supreme Court summarized the argument as follows:

"Petitioner argues that the inference that Cities was a participant in the alleged conspiracy to boycott him follows from the foregoing facts. Even viewed without reference to other facts of record, it is apparent that petitioner's main argument is that Cities' failure to follow through on its original substantial interest in dealing with him is substantial evidence of participation in the boycott allegedly organized by the other defendants. And undoubtedly, given no contrary evidence, a jury question might well be presented as to Cities' motives in not dealing with Waldron. Cf. Poller v. Columbia Broadcasting System, Inc., 368 U.S. 464 [82 S.Ct. 486, 7 L. Ed.2d 458] (1962), notwithstanding that such a failure to deal conceivably might also have resulted from a whole variety of non-conspiratorial motives involving the exercise of business judgment as to the attactiveness of the opportunity offered by petitioner. However, as we next show, the record in this case contains an overwhelming amount of such contrary evidence of Cities' motives, much of it supplied by petitioner himself." 391 U.S. at 277, 88 S.Ct. at 1587.

The Court then went on to discuss the application of Rule 56(e) to the case:

"Essentially all that the lower courts held in this case was that Rule 56(e) placed upon Waldron the burden of producing evidence of the conspiracy he alleged only after respondent Cities Service conclusively showed that the facts upon which he relied to support his allegations were not susceptible of the interpretation which he sought to give them. That holding was correct. To the extent that petitioner's burden-of-proof argument can be interpreted to suggest that Rule 56(e) should, in effect, be read out of antitrust cases and permit plaintiffs to get to a jury on the basis of the allegations in their complaints, coupled with the hope that something can be developed at trial in the way of evidence to support those allegations, we decline to accept it. While we recognize the importance of preserving litigants' rights to a trial on their claims, *we are not prepared to extend those rights to the point of requiring that anyone who files an antitrust complaint setting forth a valid cause of action be entitled to a full-dress trial notwithstanding the absence of any significant probative evidence tending to support the complaint.*" 391 U.S. at 289, 290, 88 S.Ct. at 1593. (Emphasis added).

The Sixth Circuit recently applied the *Cities Service* holding in an antitrust case involving an alleged conspiracy in Daily Press, Inc. v. United Press International, 412 F.2d 126 (6th Cir. 1969). The District Court found that there was no genuine issue of material fact, and that the charges in the complaint were wholly unfounded and unsupported by the evidence, and thus, granted defendant's motion for summary judgment. In affirming, the Court of Appeals stated that the plaintiff could no longer rely on conclusory allegations in the complaint, but, rather, must indicate a genuine issue for trial on specific facts.

In other words, the plaintiffs must present some facts to support their allegations. This plaintiffs have not done and apparently cannot do. The naked assertions and broad generalities put forth by the plaintiffs are insufficient to overcome defendant's motion for sum-

mary judgment. Bushie v. Stenocord Corp., 460 F.2d 116 (9th Cir. 1972).

Plaintiffs also contend that Miller has conspired with its distributors presently marketing its premium beer to terminate plaintiffs' distributorships of the non-premium beers (Meister Brau, Lite and Buckeye), so as to enhance Miller's competitive position in the premium beer market. Plaintiffs claim that, by terminating their franchises, Miller was able to weaken its premium beer competition by removing distributors who sell both Miller and other premium brands. This follows logically from the fact that, by forcing plaintiffs out of business, Miller causes its premium beer competition to also lose distributors of its premium beer. Plaintiffs claim that the end result of the aforesaid illegal conspiracy is that the availability of premium beers competing with said defendant's premium beer is lessened.

However, the uncontested facts, as established in the affidavit of Warren Dunn, clearly establish that this is not true. Of the 36 distributors who were sent such a letter, 18 who accepted and returned the letter continue to this day a distributor relationship with Miller; 8 did not return the letter; and 10 who returned the letter were subsequently terminated by Miller as distributors, including the plaintiffs herein, who were each terminated by notice dated September 22, 1972. In October, 1972, Miller replaced the four plaintiffs as distributors with four other distributors who were properly licensed to distribute beer in the State of Michigan.

Furthermore, · plaintiffs have not presented any affidavits which would indicate that the distributors who replaced them did not sell different brands of beer.

In Metropolitan Liquor Company v. Heublein, Inc., 305 F.Supp. 946 (E.D. Wis.1969), the defendant brought a motion under Rule 12, F.R.Civ.P., to dismiss the claim by the plaintiffs (who distributed wine for the defendant) that the defendant had violated the antitrust laws by granting additional distributorships to third parties after acquiring the stock of the company which originally had a distributorship contract with the plaintiffs. The court granted the motion to dismiss, holding at p. 949:

"This cause of action arises under 15 U.S.C. § 1 (§ 1 of the Sherman Act), which prohibits contracts, combinations, or conspiracies in restraint of trade. The conspiracy alleged is that the two defendants agreed, before the acquisition, to eliminate the plaintiff as a distributor. This may be grounds for an action under 15 U.S.C. § 18, but such allegations, even assuming that other distributors conspired also, do not state a claim upon which relief can be granted under 15 U.S.C. § 1. In Industrial Building Materials, Inc. v. Interchemical Corp., 278 F. Supp. 938, 964 (C.D.Cal.1967), the court said:

'It has been indicated previously, the Sherman Act does not apply to the exercise by a manufacturer of its power to control the sale of its products. The manufacturer may eliminate existing distributors, establish new ones, or otherwise vary its distribution program without violating the antitrust laws . . .'

"In Ace Beer Distributors, Inc. v. Kohn, Inc., 318 F.2d 283 (6th Cir. 1963), the plaintiff alleged a conspiracy between the manufacturer and another distributor to deprive plaintiff of its distributorship. The court held that even if such a conspiracy existed, that alone would not show a violation of 15 U.S.C. § 1. [Cases omitted].

"In my opinion, an action by a manufacturer or an importer to deprive a distributor of its distributorship does not state a claim for relief under 15 U.S.C. § 1. The fact that the defendant Heublein may have conspired with the defendant Vintage to accomplish this purpose does not alter the governing rule. It follows that the second cause of action must be dismissed."

■ As indicated in the *Metropolitan* case, even if there had been a conspiracy between Miller and the new distributors who took over from the plaintiffs, to deprive the plaintiffs of their distributorships, such conduct would not violate Section 1 of the Sherman Act. In Scanlon v. Anheuser-Busch, Inc., 388 F.2d 918 (9th Cir. 1968), cert. den. 391 U.S. 916, 88 S.Ct. 1810, 20 L.Ed.2d 654 (1968), the court affirmed a dismissal of the plaintiff beer distributor's complaint against the defendant brewer under the antitrust laws for wrongful termination, holding that, even if there were a conspiracy between the brewer and its new distributors

". . . to drive appellant [plaintiff] out of business . . . such a conspiracy to substitute one distributor for another even if proven, [would not] violate the antitrust laws." 388 F.2d at 920.

■ The Court notes that the conspiracy to which the plaintiffs allude must either involve Miller and its distributors, or Miller and its internal staff. No hint is given of involvement by any other party. The law is clear, as indicated above, that a conspiracy involving Miller and its distributors to deprive the plaintiffs of their former Meister Brau, Inc. distributorships does not violate Section 1 of the Sherman Act. Moreover, it is basic that Miller cannot "conspire" with itself in violation of the antitrust laws. It has been held that a complaint is subject to dismissal if it fails to allege a conspiracy with a third party.

"It is the well recognized rule that in pleading a conspiracy in an action such as this, a general allegation of conspiracy, without a statement of the facts constituting the conspiracy to restrain trade, its object and accomplishment, is but an allegation of a legal conclusion, which is insufficient to constitute a cause of action. (Citing cases).

It is basic in the law of conspiracy that you must have two persons or entities to have a conspiracy. A corporation cannot conspire with itself any more than a private individual can, and it is the general rule that the acts of the agent are the acts of the corporation." Nelson Radio & Supply Co. v. Motorola, Inc., 200 F.2d 911, 913–914 (5th Cir. 1952), cert. den. 345 U.S. 925, 73 S.Ct. 783, 97 L.Ed. 1356 (1953).

■■ Included in the plaintiffs' Section 1 conspiracy allegations are conclusory charges that Miller conspired maliciously to disparage plaintiffs and did so disparage them. It should first be clarified that actual disparagement by Miller of the plaintiffs does not constitute a violation of the Sherman Act, even if it were to constitute a common law tort. Atlanta Brick Co. v. O'Neal, 44 F.Supp. 39 (D.C.Tex.1942). Moreover, the plaintiffs have utterly failed to give any indication of what sort of disparaging remarks were made, or to whom, or when, or in what context. Consequently, their action in this regard should be dismissed. In granting a summary judgment on counts in a complaint alleging disparagement in violation of the antitrust laws, the court, in Smith-Victor Corporation v. Sylvania Electric Products, Inc., 242 F.Supp. 302 (N.D.Ill. 1965), held, at p. 307:

"In order to bring a suit for disparagement the plaintiff must allege and prove that (a) the statements referred to the plaintiff by name or the public knew that the statements referred to the plaintiff, and (b) statements were made by the defendant which disparaged the plaintiff or its product . . . ."

The plaintiffs have failed to meet this burden. They have given no indication of the type of disparagement which occurred, and it is clear that this is material. It has been held, for example, that derogatory remarks attributed to the defendant, but made to plaintiffs' representatives, rather than potential customers of the plaintiffs, did not constitute actionable disparagement because plain-

tiffs "failed to show the necessary 'statement about a competitor's goods which is untrue or misleading, and which is made to influence, or tends to influence the public not to buy.'" Edwin L. Wiegand Co. v. Harold E. Trent Co., 122 F.2d 920, 924 (3rd Cir. 1941), cert. den. 316 U.S. 667, 62 S.Ct. 1033, 86 L.Ed. 1743 (1941).

■ Thus, plaintiffs' Section 1 Sherman Act allegations state no basis for recovery, and must be dismissed. Plaintiffs have alleged naked conclusions of law with no indication in their pleadings or affidavits of any basis for their allegations. They speak of "conspiracy" and "wrongful and unlawful breach" and "disparagement", but give no indication of any conduct by Miller except the termination of their distributorship contracts and the entry into distributorship contracts with other distributors. In cases where the complaints contain nothing but conclusions, the courts have not hesitated to dismiss them. In Shotkin v. General Electric Co., 171 F.2d 236 (10th Cir. 1948), the court affirmed the dismissal of a complaint which made

". . . general allegations in the nature of conclusions, without any averment of specific acts on the part of defendants from which it could be determined as a matter of law that the defendant did in fact violate the [Sherman] Act with resulting damages to plaintiff." 171 F.2d at 239.

Plaintiffs have also alleged a violation by Miller of Section 2 of the Sherman Act in Count I, Paragraph 2, and Count III, Paragraph 3.

■ Section 2 of the Sherman Act deals with monopolization, but the only indication of the type of monopoly acquired by Miller is set forth in Count III, Paragraph 5(A) of the amended complaint, wherein it is alleged that:

"Miller has acquired monopoly power in the wholesale sales of Meister Brau, Lite and Buckeye beer in the territories within which said Distributors are located;"

Such a "monopoly" is clearly not the kind proscribed by Section 2 of the Sherman Act, which provides:

"Every person who shall monopolize or attempt to monopolize, or combine or conspire with any other person or persons to monopolize any part of the trade or commerce among the several states, or with foreign countries, shall be guilty of a misdemeanor. . ."

In United States v. E. I. duPont de Nemours and Co. (Cellophane), 351 U.S. 377, 395, 76 S.Ct. 994, 1007, 100 L.Ed. 1264 (1956), the Supreme Court established the following criteria:

"In considering what is the relevant market for determining the control of price and competition, no more definite rule can be declared than that commodities reasonably interchangeable by consumers for the same purposes make up that 'part of the trade or commerce,' monopolization of which may be illegal."

The Court further stated at page 404, 76 S.Ct. at page 1012:

"The 'market' which one must study to determine when a producer has monopoly power will vary with the part of commerce under consideration. The tests are constant. That market is composed of products that have reasonable interchangeability for the purposes for which they are produced—price, use and qualities considered."

■ The United States Supreme Court has stated, in United States v. Grinnell Corp., 384 U.S. 563, 570–571, 86 S.Ct. 1698, 1704, 16 L.Ed.2d 778 (1966), that:

"The offense of monopoly under Section 2 of the Sherman Act has two elements. [1] the possession of monopoly power in the relevant market and [2] the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen or historic accident."

Thus, a violation of Section 2 requires at least a monopoly power in a relevant

market. In the present case, the relevant market would, at an absolute minimum, include the market for beer in the State of Michigan. Yet, it is shown by the uncontested affidavit of Warren H. Dunn that Miller enjoys less than 3% of the Michigan beer market. Such a market share clearly does not constitute monopoly power. As indicated by the Honorable Learned Hand in United States v. Aluminum Co. of America, 148 F.2d 416 (2nd Cir. 1945), at p. 424, over ninety per cent of a market:

> ". . . is enough to constitute a monopoly. It is doubtful whether sixty or sixty-four per cent would be enough; and certainly thirty-three per cent is not."

■ The hallmark of monopoly power is that "power exists to raise prices or to exclude competition when it is desired to do so". American Tobacco Co. v. United States, 328 U.S. 781, 811, 66 S.Ct. 1125, 1140, 90 L.Ed. 1575 (1946); Kansas City Star Company v. United States, 240 F.2d 643, 663 (8th Cir. 1957). Thus, the potential foreclosure of 20 per cent of the market for milk products was recently held *not* to show a dangerous probability of success in a § 2 action.

> "An unlawful attempt to monopolize presupposes a 'dangerous probability' of monopolization if the attempt is successful. (Citations omitted). Twenty per cent alone of a market would be insufficient to achieve a monopoly. While size is an earmark of monopoly power, a substantial part of the market must be controlled by the monopolist to enable the raising and lowering of prices and the undue restriction on competition." Hiland Dairy, Inc. v. Kroger Company, 402 F.2d 968, 974 (8th Cir. 1968).

Clearly, then, there can be no dangerous probability of Miller successfully monopolizing the market involved in this case when it has never had more than three per cent of the beer market in Michigan.

■ Moreover, the alleged monopoly power of Miller in the wholesale sales of "Meister Brau", "Lite", and "Buckeye" beer is, in fact, a power granted to all manufacturers over sales of their trademarked products. It is undisputed that Miller acquired, and lawfully possesses, the said trademarks. Consequently, it has full power to exploit its rights therein.

The United States Supreme Court indicated, in United States v. E. I. duPont de Nemours & Co., 351 U.S. 377, at p. 393, 76 S.Ct. 994 at p. 1006, 100 L.Ed. 1264 (1956), that the power which:

> ". . . automobile or soft-drink manufacturers have over their trademarked products is not the power that makes an illegal monopoly."

Following this reasoning, the court, in Nelligan v. Ford Motor Company, 262 F.2d 556, 557 (4th Cir. 1959), held that an alleged monopoly by Ford Motor Company over the market represented by its own franchise dealers did not constitute a violation of Section 2.

Moreover, the termination by a manufacturer of other dealers at the request of its largest dealer in a given area was held not to constitute a violation of Section 2 in Packard Motor Car Co. v. Webster Motor Car Co., 100 U.S.App.D. C. 161, 243 F.2d 418 (1957), cert. den. 355 U.S. 822, 78 S.Ct. 29, 2 L.Ed.2d 38 (1957). As pointed out in Miller Motors Inc. v. Ford Motor Company, 149 F.Supp. 790 (M.D.N.C.1957), aff'd on other issues, 252 F.2d 441 (4th Cir. 1958), at p. 806:

> ". . . every manufacturer has a natural monopoly over his own product, especially when sold under his trade-name, and such a monopoly is not prohibited by the antitrust laws."

Thus, plaintiffs' amended complaint based on Section 2 of the Sherman Act must also be dismissed.

The plaintiffs, in their amended complaint, have stated that they rely on the "Clayton Act (15 U.S.C. § 1 [12] et seq.)". The Court is at a loss to deter-

mine what plaintiffs had in mind when they made this statement.

As far as the Court can determine, Sections 1 through 11 of Title 15 are not now, nor have they ever been, part of the Clayton Act.

The Clayton Act of October 15, 1914 comprises Sections 12, 13, 14–19, 20, 21, 22–27, and 44 of Title 15. Subsequent amendments to the Act have taken place on December 29, 1950 (Title 15, §§ 18, 21); July 7, 1955 (Title 15, §§ 18, 21); and on July 23, 1959 (Title 15, § 21). And, of course, Section 13 of Title 15 is now the Robinson-Patman Act.

Briefly summarized, the above Sections of the Clayton Act and Robinson-Patman Act deal with the following topics:

"12. Words defined.

13. Discrimination in price, services, or facilities.

(a) Price; selection of customers.

(b) Burden of rebutting prima-facie case of discrimination.

(c) Payment or acceptance of commission, brokerage or other compensation.

(d) Payment for services or facilities for processing or sale.

(e) Furnishing services or facilities for processing, handling, etc.

(f) Knowingly inducing or receiving discriminatory price.

13a. Discrimination in rebates, discounts, or advertising service charges; underselling in particular localities; penalties.

13b. Cooperative association; return of net earnings or surplus.

13c. Exemption of non-profit institutions from price discrimination provisions.

14. Sale, etc. on agreement not to use goods of competitor.

15. Suits by persons injured; amount of recovery.

15a. Suit by United States; amount of recovery.

15b. Limitation of actions.

16. Judgment in favor of Government as evidence; suspension of limitations;

17. Antitrust laws not applicable to labor organizations.

18. Acquisition by one corporation of stock of another.

19. Interlocking directorates and officers.

19a. Repealed.

20. Purchases by common carriers in case of interlocking directorates, etc.

21. Enforcement provisions.

(a) Commissions and Boards authorized to enforce compliance.

(b) Issuance of complaints for violations; hearing; intervention; filing of testimony; report; cease and desist orders; reopening and alteration of reports of orders.

(c) Review of orders; jurisdiction; filing of petition and record of proceeding; conclusiveness of findings; additional evidence; modification of findings; finality of judgment and decree.

(d) Exclusive jurisdiction of Court of Appeals.

(e) Preference; liability under antitrust laws.

(f) Service of complaints, orders and other processes.

(g) Finality of orders generally.

(h) Finality of orders modified by Supreme Court.

(i) Finality of orders modified by Court of Appeals.

(j) Finality of orders issued on rehearing ordered by Court of Appeals or Supreme Court.

(k) Definition of mandate.

(l) Penalties.

21a. Actions and proceedings pending prior to June 19, 1936; additional and continuing violations."

None of these sections are even remotely related to the present action. There has been no price discrimination alleged. We have no agreements not to use the goods of a competitor. The United States is not involved in this case as a party. There are no allegations relating to corporate mergers or interlocking directorates. In other words, the case has nothing to do with the Clayton Act.

 Section 4 of the Clayton Act (15 U.S.C. § 15) provides as follows:

"Any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefore in any district court of the United States in the district in which defendant resides or is found or has an agent, without respect to the amount in controversy, and shall recover three-fold the damages by him sustained, and the cost of suit, including a reasonable attorney's fee."

While this Section provides a procedural basis upon which plaintiffs can seek recovery from Miller, it does not deal with substantive wrongs as to which Miller could be found in violation. Consequently, in the absence of a wrong done to the plaintiffs under the antitrust laws, they have no independent basis for recovery under 15 U.S.C. § 15. See Englander Motors, Inc. v. Ford Motor Company, 293 F.2d 802 (6th Cir. 1961).

Plaintiffs have also alleged in their complaint that Miller violated the Federal Alcohol Administration Act ("FAAA"), 27 U.S.C. § 201 et seq. See Count I, Paragraph 2, and Count III, Paragraph 3.

The only provision of the FAAA which appears to provide any basis for a claim by the plaintiffs against Miller is 27 U.S.C. § 205, which deals with the following unlawful practices:

(a) *Exclusive Outlet*—i.e., requiring a retailer engaged in the sale of distilled spirits, wine or malt beverages (hereinafter "spirits") to purchase exclusively from one person to the exclusion of others.

(b) *Tied House*—i.e., inducing a retailer to Purchase spirits from one person through specified means to the exclusion in whole or in part of the spirits sold or offered for sale by others.

(c) *Commercial Bribery*—i.e., inducing any trade buyer by means of commercial bribery or giving of bonuses, etc. to purchase spirits from one person to the exclusion in whole or in part of spirits sold or offered for sale by others.

(d) *Consignment sales*—i.e., selling, offering for sale, or contracting to sell to any trade buyer spirits on consignment or under conditional sale with the privilege of return.

(e) *Labeling*—i.e., selling, shipping, etc. spirits in bottles not properly labeled.

(f) *Advertising*—i.e., publishing or advertising in a manner not conforming to regulations prescribed by the Secretary of the Treasury.

Nowhere in the plaintiffs' complaint or affidavits are there any allegations which remotely approach the conduct proscribed by the FAAA. Consequently, it is clear that all allegations regarding the FAAA must be dismissed.

Plaintiffs have also alleged an unlawful breach of contract by Miller. The main thrust of plaintiffs' allegations appear in Count II, which states:

1. That they had contractual arrangements with Meister Brau, Inc. whereby they were given express and/or implied representations, promises and assurances that Meister Brau, Inc. and any corporation acquiring trademarks from it would continue to supply beer products to plain-

tiffs. (No time limit was alleged and no written contract is alleged.)

2. That Miller, by acquiring trademarks from Meister Brau, Inc., assumed all existing expressed and/or implied contractual obligations and duties, including Meister Brau, Inc.'s aforementioned obligations to the plaintiffs.

3. That Miller wrongfully disapproved such obligations.

4. That Miller wrongfully terminated plaintiffs.

5. That the plaintiffs involuntarily consented under duress to the contracts attached to the Affidavit of Warren H. Dunn as Exhibits B–1, B–2 and B–3, and that the said contracts are unenforceable because they lack mutuality and are contracts of adhesion and are unreasonable and unconscionable.

6. That defendant entered into an implied agreement with plaintiffs to continue plaintiffs as distributors of Meister Brau, Lite and Buckeye beer products and assured plaintiffs that they could continue as a distributor of defendant so long as plaintiffs continued to do a good job of marketing defendant's product.

▪ Generally, where one corporation sells or otherwise transfers all of its assets to another corporation, the latter is not liable for the debts and liabilities of the transferor, except (1) where the purchaser expressly or impliedly agrees to assume such debts; (2) where the transaction amounts to a consolidation or merger of the corporation; (3) where the purchasing corporation is merely a continuation of the selling corporation; and (4) where the transaction is entered into fraudulently in order to escape liability for such debts. Vol. 15, Fletcher Cyclopedia, Corporations, § 7122, p. 187.

▪ Paragraph 13 of this Agreement provides that it is to be construed in accordance with the laws of the State of Wisconsin. In that regard, the laws of Wisconsin clearly permit a purchaser to buy assets without assuming liabilities:

" . . . The well settled rule of American jurisdictions, including Wisconsin, is that a corporation which purchases the assets of another corporation does not, by reason of succeeding to the ownership of property, assume the obligations of the transferor corporation . . ." Forest Laboratories, Inc. v. Pillsbury Co., 452 F.2d 621, 625 (7th Cir. 1971) (applying Wisconsin law).

Michigan law is identical to the law of Wisconsin in this regard. In Chase v. Michigan Telephone Co., 121 Mich. 631, 80 N.W. 717 (1899), the Michigan Supreme Court held that the purchase of the assets of a company does not result in the assumption of liabilities by the purchaser. Consequently, the Court reversed a lower court decision, permitting a tort claim against a company which had purchased the property and franchises of the selling company:

"Where no intention appears to transfer the old obligations to the new company, the new company is not liable, but creditors must look to the assets of the old company." 121 Mich. at p. 635, 80 N.W. at p. 719.

See also, Clark v. Detroit Curling Club, 298 Mich. 339, 341, 299 N.W. 99, 100 (1941), in which the court held because there "was no assumption with promise to pay obligations of the old corporation", the corporation which acquired assets was not liable to a creditor of the transferor.

▪ Plaintiffs, however, claim this case comes under one or more of the above enumerated exceptions to the general rule. Specifically, plaintiffs claim there has been an implied assumption of Meister Brau's obligations by Miller. However, a promise to pay or assume debts of another corporation cannot be implied from the mere fact that it has received the property or assets of the latter. Clark v. Detroit Curling Club, *supra.* Moreover, a promise to pay or

assume may only be implied where the conduct or representatives of the buying corporation are evidence of an intention to do so. Fletcher Cyclopedia, Corporations, Vol. 15, § 7125.

For example, in Architectural Building Products, Inc. v. Cupples Products Corp., 221 F.Supp. 154 (E.D.Wis.1963), plaintiff, a distributor, brought an action for damages for wrongful termination of a representation contract which it had with one corporation, and was subsequently acquired by another corporation through an exchange of stock. The court held that, in the absence of a showing that the acquiring corporation had evidenced an intent to assume liabilities of the acquired corporation, the acquiring corporation could not be sued for alleged wrongful termination of a representation contract. See also, Pennison v. Chicago, Milwaukee & St. Paul Ry. Co., 93 Wis. 344, 67 N.W. 702 (1896), where the court held that a railroad company which bought the assets of another railroad company did not automatically assume tort liabilities.

In the present case, the acts of Miller clearly establish that it did not intend to assume any of the liabilities of Meister Brau. The clearest evidence of this intent is the written contract entered into between Miller and Meister Brau, which provides:

"Buyer does not and under no circumstances shall Buyer become obligated to assume any of the obligations of Seller under any of the distributorship agreements Seller may have had with any of Seller's distributors. Sales by Buyer to such distributors shall not be regarded as an assumption of any such obligations. It is contemplated that Buyer is to be free to distribute the brands of beer subject to this Agreement through distributors of Buyer's selection."

Under such circumstances, there can be no question of an implied assumption of Meister Brau's obligations by Miller. Moreover, nowhere have plaintiffs established by affidavit or otherwise what these contractual relationships between themselves and Meister Brau might have been. Plaintiffs have alluded to some form of oral agreement between themselves and Meister Brau, but they have not come forward with any specifics. For all the Court knows, these agreements were terminable at will.

On the other hand, there was, in fact, an agreement between Miller and each of the plaintiffs. This agreement is embodied in a letter from Miller, which was accepted by each of the plaintiffs. The letter provides:

"As you know, the Miller Brewing Company has purchased the 'Meister Brau', 'Lite', 'Buckeye' and other trademarks from Meister Brau, Inc.

While we have not assumed any of Meister Brau's rights or obligations under any agreement or arrangement you might have had with Meister Brau, Inc., we, as seller, hereby offer to make sales to you, as buyer, of the brands of beer you previously purchased from Meister Brau, Inc., or its Buckeye Division, with the understanding that you bear the responsibility actively and aggressively to market and distribute such brands of beer to retailers and other persons to whom you are legally authorized to sell beer in the Area of Responsibility previously set forth for you by Meister Brau, Inc. or its Buckeye Division.

With regard to your Area of Responsibility, Miller does not restrict you as to where or to whom you may resell beer. State laws (such as Illinois) may do so.

Our relationship is that of seller and buyer and in no other respect is any relationship established between us. You are not required to place orders, nor are we required to accept orders for beer. As is the custom in our industry, these sales are made on a shipment-to-shipment basis only, and either of us can terminate this relationship at any time without incurring liability to the other. You are and shall remain an independent busi-

ness and neither of us is in any sense to be regarded as the principal or agent or employe of the other.

All beer sold to you will be sold F. O.B. our plant and the title and risk of loss passes to you (with a lien thereon reserved by Miller until payment is received) at the time the beer is delivered to you or to a carrier for shipment to you. All sales to you are to be on a cash basis or on such credit terms as may, from time to time, be established by Miller.

Order and shipment procedures will be explained to you when you call the Regional Office listed below.

We are sending this letter to you in duplicate with the understanding that the terms hereof do not become effective until one copy, signed by you in the space below, has been returned to us within fifteen days of your receipt of this letter."

Clearly, this letter could not be interpreted as encouragement to plaintiffs to incur additional expenses or indebtedness through additional investment in inventory, warehouses, manpower, trucks and other equipment.

The letter also expressly states that the relationship of the parties is to be that of buyer and seller. Under no circumstances could plaintiffs be said to be agents of Miller. Thus, the rule set forth in Terre Haute Brewing Co. v. Dugan, 102 F.2d 425, 427 (8th Cir. 1939), which states:

" . . . [If] it appears that the agent, induced by his appointment, has incurred expense in the matter of the agency without having had sufficient opportunity to recoup such from the undertaking, the principal will be required to compensate him in that behalf."

has no application in the present case.

Plaintiffs argue that the so-called "letter agreement" quoted above is unenforceable for lack of mutuality. The general rule appears to be:

"Contracts between a producer, manufacturer, or other seller and a jobber, distributor, retailer, or other buyer which contemplate the distribution or resale of the products of the former by the latter sometimes known as contracts of sales agency, or of distributorship or dealership, *must, as a general rule, be mutually obligatory on both parties in order to be enforceable. Contracts of this nature generally lack mutuality and are unenforceable where performance thereunder is not obligatory on one or both of the parties, as where the contract is terminable at will. Thus, generally, mutuality is lacking where the contract does not bind the seller to sell or deliver, as well as where no definite obligation to buy or otherwise perform is placed on the buyer.* So, such an agreement looking to the sale and purchase of merchandise without specification of the amount to be bought or sold and duration of the contract or with arbitrary right of termination lacks mutuality and is unenforceable." 77 C.J.S. Sales § 20(h), pp. 619, 620. (Emphasis supplied).

Thus, in Bendix Home Appliances v. Radio Accessories Co., 129 F.2d 177, 179, 181, 182 (8th Cir. 1942), the parties thereto entered into an agreement whereunder plaintiff granted to the defendant an exclusive distributorship. The court held the distributorship agreement unenforceable for lack of mutuality, stating:

"It was expressly stipulated in the contract that Radio Accessories was not appointed an agent of Bendix Incorporated for any purpose whatsoever and that *the contract was terminable at will of either party with or without cause. Radio Accessories did not agree to buy and Bendix Incorporated did not agree to sell any stipulated number of Bendix products.*"

The Court held:

" . . . [W]here the arbitrary and unrestricted right of cancellation is reserved to one or both parties, contracts like the one here are binding only to the extent that they have been performed. *Since the contract is ex-*

*pressly made terminable at the will of either party, with or without cause, it is not enforceable by either party.* A demand for performance by one party may always be met by a repudiation of the whole contract by the other, *the agreement between them furnishing the basis upon which the parties may deal with each other if they so desire,* but with no obligation upon either requiring a continuation of relations." (Emphasis supplied).

■ Under the rationale of the aforementioned decision, it is beyond doubt that the letters of agreement in question are unenforceable for lack of mutuality. Either party, Miller or plaintiffs, could terminate said letter agreements at will without cause. Furthermore, said agreements neither obligated Miller to sell, nor plaintiffs to buy, the beer products involved herein.

This conclusion, however, is merely a restatement of the obvious. It is the clear intent of the agreement to obviate any obligation of future performance with respect to both parties. The absence of mutuality is not the result of mistake or machination, nor is it concealed in clever or cunning language; it is the clear intent of the agreement and, presumably, that of the signators thereto.

■ Moreover, it is not accurate to say that such an agreement is null or void. It is merely prospectively unenforceable. With regard to past or present activities, it is clear that the agreement is viable, and provides "a basis upon which the parties may deal with each other if they so desire". Bendix Home Appliances, *supra.* The agreement is, therefore, valid to the extent that it describes the relationship of the parties as they perceived it and desired it to be.

Plaintiffs, aware of this obvious fact and its fatal consequences, allege by complaint and affidavit that the letter agreement was superseded by a subsequent oral agreement, which provided "that there would in fact be no essential change in their relationship with the brewery, that is that as long as plaintiffs continued to do a good job for Miller that they would continue to be beer distributors for Miller, just as they had been beer distributors for Meister Brau, Inc." As indicated previously (pages 904, 905), the Court has no information regarding plaintiffs' prior relationship with Meister Brau, Inc.

Additionally, the situation is not unlike that in a recent case involving Miller, wherein an *identical* termination clause was invoked by Miller against a distributor and upheld by the Third Circuit. In Jay-El Beverages, Inc. v. Miller Brewing Company, 461 F.2d 658 (3rd Cir. 1972), the court granted a summary judgment to Miller in a suit brought by a terminated distributor, holding at p. 659:

"As to termination it [the contract] stated:

'As is the custom in our industry these sales to you are made on a shipment to shipment basis only. Either of us can terminate this relationship at any time without incurring liability to the other.'

We agree with the trial court that this unequivocal language *precludes the use of parole evidence* for purposes of interpretation.

Either party had the right to terminate the arrangement at will without cause, see, Associated Beverages Co. v. P. Ballantine & Sons, 287 F.2d 261 (5th Cir. 1961), and, Prince v. Miller Brewing Co., 434 S.W.2d 232 (Tex. Civ.App. 1968)." (Emphasis supplied).

■■ Finally, although the Court chooses not to consider the parole evidence, the oral agreement is of little potential benefit to the plaintiffs. The essence of the oral agreement was that the plaintiffs could continue to handle defendant's products as long as plaintiffs performed satisfactorily. Such agreements, be they oral or written, have been held to be terminable at will by either party. Since the agent is under no

obligation to continue to represent the principal, the termination of the contract by the latter is not a breach of the contract, and will not sustain an action for damages. Meredith v. John Deere Plow Co., 185 F.2d 481 (8th Cir. 1950), cert. den. 341 U.S. 936, 71 S.Ct. 856, 95 L.Ed. 1364 (1951). The substitution of the alleged oral agreement would put plaintiffs in no better position than they are in with the "letter agreements".

Plaintiffs additionally claim that the so-called "letter agreements" are unconscionable because they provide for termination which is effective immediately upon notification. In support of their position, plaintiffs cite the following Michigan state statute:

"Termination of a contract by one party except on the happening of an agreed event requires that reasonable notification be received by the other party and an agreement dispensing with notification is invalid if its operation would be unconscionable." M.S.A. § 19.2309(3), M.C.L.A. § 440.-2309(3).

M.S.A. § 19.2302, M.C.L.A. § 440.2302 reads:

"(1) If the Court as a matter of law finds the contract or any clause of the contract to have been unconscionable at the time it was made the Court may refuse to enforce the contract, or it may enforce the remainder of the contract without the unconscionable clause, or it may so limit the application of any unconscionable clause as to avoid any unconscionable result.

"(2) When it is *claimed* or *appears* to the Court that the contract or any clause thereof may be unconscionable the parties *shall* be afforded a reasonable opportunity to present evidence as to its commercial setting, purpose and effect to aid the Court in making the determination."

■■ In the present case, plaintiffs did receive notice of the termination of the agreements. Thus, we do not have a situation in which notification had been dispensed with. The fact that the contracts were terminable immediately upon notice to the opposite party do not make them unconscionable per se. In fact, in Central Ohio Cooperative Milk Producers v. Rowland, 29 Ohio App.2d 236, 281 N.E.2d 42, 44 (1972), the Appellate Court reversed the trial court's decision, which held that the following clause was unconscionable:

"Either party may cancel this agreement on any anniversary date of (sic) his contract by giving written notice thereof to the other party within the first fifteen days of a forty-five day period immediately preceding the anniversary date of this contract."

■■ The Court agrees that, generally, if a court concludes that a contract, or any term thereof, is *possibly unconscionable, an evidentiary hearing is required.* However, in the present case, plaintiffs have produced nothing by way of affidavit or otherwise which would raise even an inference that the termination clause involved here is unconscionable. At the time of the agreement, Miller was under no obligation, legal or moral, to do any business with the plaintiffs, and it was the clear intent of the agreement that there be no future obligations with respect to either party. There is, therefore, no possibility that the agreement was unconscionable at the time it was made nor in its operation. Plaintiffs have introduced nothing persuasive to the contrary, despite this obvious opportunity to do so.

■ Plaintiffs also state by affidavit that the signing of the letter agreements was the result of "duress and coercion for fear that if they refused, they would loose their distributorship of the aforesaid products". Such an averment, even if true, would not support relief.

It is clear that, with respect to a "distributorship", the plaintiffs had nothing to lose. Insofar as Meister Brau sold the rights to market the products in question, plaintiffs may have had an action against Meister Brau. They certainly had no rights against Miller (*su-*

*pra*, p. 903). Consequently, there could have been no duress on the part of Miller, which was merely affording plaintiffs an opportunity to market products which they otherwise would not have had.

■ Besides the above infirmity, it is established that various forms of commercial pressure, as exercised in the marketplace, do not constitute legal duress. Hartsville Oil Mill v. United States, 271 U.S. 43, 49, 46 S.Ct. 389, 70 L.Ed.2d 822 (1926); Hellenic Lines Ltd. v. Louis Dreyfus Corp., 372 F.2d 753, 758 (2nd Cir. 1967); Alloy Products Corp. v. United States, 302 F.2d 528, 530, 157 Ct.Cl. 376 (1962); Gill v. S. H. B. Corp., 322 Mich. 700, 34 N.W.2d 526 (1948).

In view of all of the above considerations, it is ordered that defendant's Motion for Summary Judgment be, and is, hereby granted.