515 P.2d 140

**EQUITABLE BUILDING AND LOAN ASSOCIATION, Roswell, New Mexico, et al., Relators-Appellants and Cross-Appellees,**

v.

**Roy DAVIDSON, Commissioner of Banking of the State of New Mexico, et al., Respondents-Appellees and Cross-Appellants,**

v.

**SANDIA SAVINGS AND LOAN ASSOCIATION, Intervenor-Appellee and Cross-Appellant.**

**No. 9570.**

Supreme Court of New Mexico.

Oct. 5, 1973.

Standley, Witt & Quinn, Donald W. Miller, Santa Fe, for relators-appellants and cross-appellees.

David L. Norvell, Atty. Gen., Thomas P. Whelan, Asst. Atty. Gen., Santa Fe, for respondents-appellees and cross-appellants Davidson, and others.

Bigbee, Byrd, Carpenter & Crout, Richard N. Carpenter, Jay C. Carlisle II, Santa Fe, for intervenor-appellee and cross-appellant.

## OPINION

MONTOYA, Justice.

On March 27, 1972, the appellee Sandia Savings and Loan Association (Sandia) and the New Mexico Savings and Loan Association (NMSLA), each with its principal place of business and home office in Albuquerque, Bernalillo County, New Mexico, filed an application before Mr. Snider Campbell (Campbell), the savings and loan supervisor of the New Mexico Department of Banking, seeking approval of the transfer from NMSLA to Sandia of permits to do business in the branch offices of NMSLA located in Clovis, Roswell and Las Cruces, New Mexico. On March 30, 1972, Campbell issued Order No. 72–3 authorizing the transfer whereby Sandia acquired the aforementioned three branch offices.

The Equitable Building and Loan Association, Roswell, New Mexico, and other savings and loan and building and loan associations located in Roswell, Clovis and Las Cruces (appellants), sought and were granted an alternative writ of mandamus in the District Court of Santa Fe County, directed to Campbell, Mr. Roy Davidson (Davidson) the commissioner of banking, and the State of New Mexico (respondents), seeking complete rescission of the aforementioned Order No. 72–3, or, in the alternative to rescind the order and set a hearing date to determine whether the acquisition of the branch offices in question was in violation of the New Mexico Savings and Loan Act. A formal written demand seeking the same remedy had been made by appellants and refused by the Banking Department prior to the application for the alternative writ of mandamus. The alternative writ alleges that appellants were parties beneficially interested; that the action of the Department of Banking was arbitrary, capricious and unlawful; that no plain speedy or adequate remedy at law existed.

After the granting of the writ, the attorney general, in behalf of Campbell, Davison and the State, filed a motion to quash the alternative writ. Shortly thereafter, Sandia sought and was granted leave to intervene and also filed a motion to quash the writ. The State, the officials of the

Department of Banking and Sandia will hereinafter be referred to as "appellees."

Several other pretrial pleadings were filed and argued and, at the hearing on the motions to quash the alternative writ, the District Court of Santa Fe County granted the motion to quash the alternative writ and dismissed the petition.

In addition to the petition filed in the Santa Fe County District Court on the basis of which the alternative writ was granted, the appellants, after the issuance of the order by the savings and loan supervisor approving the transfer of the branch offices, filed appeals from said order in the District Court of Santa Fe County and in the district courts where the branch offices in question were located, being Curry, Chaves and Dona Ana Counties. No disposition of the appeals appears in the record, although appellants mention in their brief that the appeals filed in the Dona Ana and Curry County District Courts had been dismissed.

The Santa Fe District Court order, though containing no findings, contains recitals to the effect that the relators-appellants had "standing herein" and that there was

> "no adequate remedy at law available to Relators, but there being no clear legal duty on Respondent's [Commissioner of Banking and Savings and Loan Supervisor] part to act as requested in Relators' Alternative Writ of Mandamus[.] * * *"

This appeal and cross appeal then ensued.

Three main contentions are raised by the parties:

(1) Whether appellants lack standing to seek relief by way of mandamus;

(2) Whether the appellants had a clear, adequate legal remedy; and

(3) Whether the officials of the Banking Department had a clear, legal duty to hold a hearing prior to the issuance of its Order No. 72–3, and the right of appellants to appear and be heard at such hearing.

We address ourselves to the resolution of the third issue as we believe it will be dispositive of this appeal.

Appellants vigorously assert that there was a clear legal duty to hold a public hearing after notice before the entry of the order on the part of the savings and loan supervisor approving the transfer of the branch offices in question. It appears to be an undisputed fact that all existing savings accounts in the branch offices were to be transferred to the home office of NMSLA, and that the only difference in the operation of the branch offices was that, upon their acquisition by Sandia, the savings accounts in the branch offices would be insured and regulated by the Federal Savings and Loan Insurance Corporation, in addition to the New Mexico Department of Banking, and that the order approving the transfer required, as one of the conditions of approval, an infusion of new capital to increase the net worth of Sandia. Appellants' argument is that the clear legal duty to hold the public hearing is required by the terms of subsection "A" of § 48–15–61, N.M.S.A., 1953 Comp. (Repl. Vol. 7, 1966, 1971 Pocket Supp.), which reads as follows:

> "A. Any association authorized to transact business in this state may conduct a branch or branches with the powers and limitations provided in the Savings and Loan Act [48–15–45 to 48–15–142]. The association shall first file an application with the supervisor, accompanied by an investigation fee of two hundred dollars ($200). The supervisor shall conduct a hearing on the application after giving the same notice as provided for in section 11 [48–15–55] of the Savings and Loan Act. Opportunity shall be offered any interested person to present evidence and argument. After hearing, the supervisor shall, in his discretion, grant or deny the application in writing. In exercising his discretion, the supervisor shall take into account, but not by way of limitation, such factors as the financial history and conditions of the applicant association, the

adequacy of its capital structure, its future earning prospects and the general character of its management. Approval shall not be given until he is satisfied that:

"(1) establishment of the branch will meet the needs and promote the convenience and advantage of the community in which the business of the branch is to be conducted; and

"(2) the probable volume of business and reasonable public demand in the community are sufficient to assure and maintain the solvency of the branch and of the existing association or associations in the community."

It is to be noted that the statute provides for the exercise of discretion by the savings and loan supervisor, setting forth factors that must be taken into account in considering such application. It is noteworthy that the statute then continues in subparagraphs (1) and (2) of said subsection "A" supra, that the supervisor shall not approve the application until he is satisfied as required by the terms of the said subparagraphs.

█ It is apparent to us that subsection "A" supra, on which appellants rely, applies only to an application for a new branch, particularly when the criteria set forth in subparagraphs (1) and (2), supra, are given a common sense and reasonable construction. In Trujillo v. Romero, 82 N.M. 301, 305, 481 P.2d 89, 93 (1971), we stated:

"In construing statutes we seek only the legislative intent. [Citations omitted.] The entire act is to be read as a whole and each part shall be construed in connection with every other part so as to produce a harmonious whole. [Citations omitted.].

" * * *.

"We should consider the consequences of various possible constructions and should not adopt a construction which would defeat the legislature's intentions, or lead to absurd results. [Citations omitted.]"

As we read the criteria, to be applied, it can only have reference to a branch that is not yet in existence, and it follows that the purpose of the hearing requirements is to have evidence presented that the factors and standards described in the statute can or cannot be met. We, therefore, hold that the hearing requirement of § 48–15–61(A), supra, does not apply to the transfer of the existing branches approved by Order No. 72–3.

Next, appellants contend that the appellees cannot claim the benefit and advantage of the so-called "grandfather clause" contained in subsection "D" of § 48–15–61, supra, reading as follows:

"D. Branches of a parent association authorized under the Savings and Loan Act may do business the same as the parent association, but branches must be located within a radius of fifty [50] miles from the principal office of the parent association, within the state of New Mexico. The provisions of this subsection are not retroactive with respect to branches established or approved by the commissioner of banking prior to the effective date of the Savings and Loan Act."

The order authorizing the transfer contains a finding that is undisputed to the effect that both Sandia and NMSLA had home offices in Albuquerque, New Mexico, and that the branch offices in question had franchises and operated under said authority since 1960. It also contains a further finding that, by express statutory provision, the three branches had been exempted from the limitations contained under § 48–15–61(D), supra.

In considering the legislative history, we find that prior to 1963 there were no statutes in existence with reference to the establishment of branch offices for savings and loan associations. Then, in 1965, specific provisions providing for branch office applications were enacted but contained no requirement for a hearing. Laws 1965, ch. 302. Thereafter, in 1967, the new Savings and Loan Act was passed and, under the

terms of § 17 of that Act (§ 48–15–61, supra), a hearing is required prior to the issuance of any authority for the establishment of branch offices. Both the 1965 and 1967 Acts contain "grandfather clauses" stating that the provision of the Act with respect to the distance locations of said branch offices from the principal or home offices is not retroactive with respect to branch offices authorized by the Commissioner of Banking prior to the effective dates of either Act. This legislative history not only leads to the interpretation that no hearing was required prior to 1967 for the establishment of branch offices, but also to the conclusion that the "grandfather clause" was to preserve rights acquired by existing branches with respect to distance locations from the principal home office.

There are no provisions in the New Mexico Savings and Loan Act relating to the sale and transfer of existing branch offices from one association to another. Appellants contend that the benefits of the "grandfather clause" could be claimed only by the parent association which owned the subject branches in 1967. To arrive at a resolution of this question we must consider what rights are acquired by branch offices, the corporate powers of the parent association, as well as public policy considerations that may be involved.

■ The standards provided in the Savings and Loan Act for the establishment of branch offices, how such authority is acquired, together with the regulation of the business once authorized, leads to the conclusion that the right to conduct a business at an office other than the principal office is a franchise. In Elliott v. City of Eugene, 135 Or. 108, 113, 294 P. 358, 360, the Supreme Court of Oregon, in discussing the meaning of a franchise, stated as follows:

> "Chief Justice Taney's definition of the word 'franchise' has been much employed. He pointed out that franchises are special privileges conferred by the government on individuals, and which do not belong to the citizens of the country generally of common right. [Citations omitted.]"

In this country, a franchise is a privilege or immunity of a public nature, which cannot be legally exercised without a legislative grant. There are to kinds of franchises: (1) The corporate or general franchise, which authorizes the corporate organization and existence; and (2) the special or secondary franchise which consists of the special rights, privileges and grants conferred upon existing corporations.

> "Generally speaking, all the franchises possessed by a corporation, except the franchise to be a corporation, are regarded as special or secondary franchises. * * *"

6A Fletcher Cyclopedia Corporations, § 2871 at 424–425 (Perm.Ed.1968). "A franchise, whether general or special, is generally considered as property[.]" 6A Fletcher, supra, § 2864 at 416. We believe that the branch offices in question herein can be considered as a secondary franchise and as a property right of the corporation.

We next consider the question whether such branch offices or corporate franchises can be transferred. In 6A Fletcher, supra, § 2925 at 611–612 the following general rule in that regard is stated:

> "Nothing is better settled in the law of corporations than the general doctrine that a corporation has, as an incident to its ownership of property, real or personal, the same capacity and power as a natural person to dispose of and convey it, provided it does not do so for a purpose which is inconsistent with or foreign to the objects for which it was created, and provided, further, it violates no charter or statutory restriction, or rule of law based upon public policy. * * *"

The above rule has been followed in Price v. Fraser, 119 Neb. 806, 813, 231 N. W. 18, 21, (1930):

> " 'All corporations capable of taking and holding property have the jus disponendi as fully as natural persons, except

so far as they are restrained by statute, or are prohibited by their articles of incorporation or outstanding contracts; and under this general power a corporation may dispose of the whole of its property for any lawful purpose.' "

■ In defining general corporate powers of a building and loan association, § 48–15–77, N.M.S.A., 1953 Comp. (Repl. Vol. 7, 1966, 1971 Pocket Supp.), states that every association incorporated under the Savings and Loan Act has all the powers authorized by the corporation laws of this state and "all other powers incident to, or necessary for, the purpose of properly carrying on its business." As to the powers authorized by the corporation laws of this state, § 51–24–4, N.M.S.A., 1953 Comp. (Repl. Vol. 8, pt. 1, 1962, 1971 Pocket Supp.), among others, provides that each corporation has power to "sell, convey, mortgage, pledge, lease, exchange, transfer and otherwise dispose of all or any part of its property and assets [.]" Under § 48–15–28, N.M.S.A., 1953 Comp., repealed by the present Savings and Loan Act, building and loan associations were incorporated under the general corporation laws of the state. It was under this latter law that NMSLA and Sandia were organized in corporate form pursuant to such Act. There being no statutory prohibition against a transfer of a branch office, it would appear that public policy would not be violated either, particularly when the regulatory agency charged with the supervision of such business has approved the transfer and prescribed conditions which must be met before such approval is authorized. Additionally, the effect of the transfer in the instant case would be to provide the new depositors in the branch offices with insured accounts and make available the credit facilities of the Federal Home Loan Bank to the three branch offices.

Appellants appear to agree that savings and loan branch offices and the permits to do business may be alienable, but contend that the benefits of the "grandfather clause" could not be claimed by the branch offices but only by the parent association, and that by reason thereof the transfer could not be authorized without a hearing. In discussing the construction of the "grandfather clause," appellants cite Rich v. State Board of Optometry, 235 Cal. App.2d 591, 45 Cal.Rptr. 512 (1965). That case involved branch offices of an optometrist and was concerned with the relocation of branch offices by the same licensee rather than a transfer. Although the California statute prohibited the sale of branch offices, the court held that the "grandfather clause" in the statute regulating the number of branch offices that could be operated merely prohibited the State Board of Optometry from limiting the number of branch offices that were in operation on October 1, 1959, and that an optometrist is entitled to continue to operate the same branches that he operated on that date. They further held that, under the statutory scheme, the optometrists were entitled to relocate their branch offices and thus retain the competitive advantage which they were given by the statute. The court construed the "grandfather clause" to give protection not to the specifically located branch offices but to the number of branch offices operated by the optometrist on the October 1, 1959, date.

■ The question to be resolved is whether the branch offices established under the "grandfather clause" of the Savings and Loan Act can be transferred without the requirement of notice and hearing, and without meeting the required conditions necessary for the establishment of a new branch office. We have discussed the question of secondary franchises and their transferability heretofore.

Volume 6A, Fletcher, supra, § 2877 at 436–437, states in part:

"The special franchise may, according to the weight of authority, be sold or assigned, and it may survive the corporation that received it and exercised it. * * *"

In Village of Constantine v. Michigan Gas & Electric Co., 296 Mich. 719, 296 N. W. 847 (1941), it was held that a state franchise to produce and supply electricity

to the Village, acquired under a 1905 Act, was assignable as a "property right" by one corporation to another, the court saying that, at the time of the transfer, corporations formed under general law could sell and convey their property and franchise to any corporation formed under the same law. In that case, the Village, before the transfer question came up, had entered into a street lighting contract with the assignee.

In 6A Fletcher, supra, § 2887 at 456–457, it is stated:

"A special or secondary franchise granted by the state or municipality and accepted by the grantee thereupon becomes a contract between the parties with, generally speaking, the usual contractual rights, liabilities and obligations. Thus, such a franchise is a contract within the constitutional provision prohibiting the impairment of contracts, except where the constitution or statutes contain provisions to the contrary. * * *"

While there is no express provision in the Savings and Loan Act relating to the sale or transfer of a branch office permit, § 48–15–60, N.M.S.A., 1953 Comp. (Repl. Vol. 7, 1966, 1971 Pocket Supp.), dealing with the exclusive use of the corporate name, in subsection "B" contains the following language:

"B. No certificate or incorporation of a proposed association having the same name as any other association authorized to do business in this state under the Savings and Loan Act, or a name so nearly resembling it as to be calculated to deceive, shall be issued by the supervisor except to an association formed by the reincorporation, reorganization or consolidation of other associations, *or upon the sale of the property or franchise of an association.*" (Emphasis added.)

It would appear to us that, by the use of the foregoing language, the legislature did not intend to prohibit the sale of the property or franchise of an association, but by implication authorized such sale. Otherwise, the clause "sale of the property or franchise of an association" would be meaningless. In view of such plain language and all of the foregoing, we hold that there was no clear legal duty on the part of the officials of the Banking Department to hold a hearing prior to the issuance of its Order No. 72–3.

The resolution of the two other contentions raised by the parties, including the cross appeal wherein the question of standing to sue on the part of the appellants and the non-existence of an adequate legal remedy to attack the validity of the order in question, will not be considered since the decision herein makes a discussion of such issues unnecessary and would serve no beneficial purpose.

Accordingly, the order of the district court, quashing the alternative writ of mandamus and dismissing the appellants' petition, is affirmed.

It is so ordered.

STEPHENSON and MARTINEZ, JJ., concur.