565 P.2d 1019

SOUTHWEST DISTRIBUTING COMPA-
NY, a New Mexico corporation,
Petitioner-Appellee,

v.

OLYMPIA BREWING COMPANY, a
Foreign Corporation,
Respondent-Appellant.

No. 10802.

Supreme Court of New Mexico.

June 27, 1977.

Keleher & McLeod, John B. Tittmann, Albuquerque, for respondent-appellant.

Knight, Sullivan, Villella, Skarsgard & Michael, Albuquerque, for petitioner-appellee.

Campbell & Bingaman, Santa Fe, for amicus curiae, Distilled Spirits Council of the United States.

Olmsted & Cohen, Charles D. Olmsted, Santa Fe, Fordyce & Mayne, Frederick M. Switzer III, St. Louis, Mo., for amicus curiae, Wine & Spirits Wholesalers of America, Inc.

## OPINION

McMANUS, Chief Justice.

Petitioner-appellee Southwest Distributing (hereinafter Southwest) sought a mandatory injunction against respondent-appellant Olympia Brewing Company (Olympia), seeking to require Olympia to supply and sell Hamm's beer to Southwest for resale throughout New Mexico. The trial court temporarily restrained and enjoined Olympia from terminating the supply of Hamm's beer to Southwest, and on December 8, 1975 it permanently enjoined Olympia therefrom. Olympia appeals and we reverse.

A distributor of beer, wine, liquor, institutional grocery and sanitary supplies, Southwest has been a distributor of Hamm's beer in New Mexico since 1947, and the exclusive distributor since 1951. The distributorship agreement between Southwest and the Theodore Hamm Company (Hamm) was oral, did not provide for any fixed termination date, did not specify the quantity to be purchased or sold, or stipulate any other terms. Southwest's distributorship of Hamm's beer continued under the changes in ownership in the Theodore Hamm Company occurring in 1965 and in 1973.

On February 20, 1975, Olympia purchased certain of Hamm's assets, including its St. Paul brewery and the Hamm trademark. In a letter dated February 28, 1975, Olympia advised former Hamm distributors, including Southwest, that it would ship Hamm's beer to them on an "order to order" basis, pending Olympia's evaluation of how those Hamm distributors would fit in the Olympia distribution network. On April 11, 1975, the Alcohol Beverages Franchise Act, § 46–9–16 through –20, N.M.S.A. 1953 (Supp.1975), went into effect. In a letter dated April 12, 1975, Olympia notified Southwest that Olympia could better serve

the New Mexico market through another distributor and would no longer accept orders from Southwest. Olympia's last shipment to Southwest was delivered prior to April 11, 1975 and no subsequent shipments were made after that date, whereupon Southwest sought to enjoin Olympia from terminating the supply of Hamm's beer to Southwest.

The trial court enjoined Olympia from terminating Southwest's distributorship on the bases that (1) Southwest had a vested property right in the distributorship; (2) Olympia purchased the assets of Hamm with an encumbrance thereon for the distributorship agreements; (3) the contractual agreement between Hamm and Southwest could not be terminated by Olympia without good cause; and (4) the Alcohol Beverages Franchise Act applied to the Olympia-Southwest transaction and that Olympia had violated the Act. The trial court erred in reaching these conclusions.

I. Vested Property Right

Southwest claimed, and the district court found, that Southwest had a vested "property right" in Hamm's beer and the beer distributorship. Southwest relied on *Equitable Building and Loan Ass'n v. Davidson,* 85 N.M. 621, 515 P.2d 140 (1973); *Muckleroy v. Muckleroy,* 84 N.M. 14, 498 P.2d 1357 (1972); and *People v. Wisch,* 58 Misc.2d 766, 296 N.Y.S.2d 882 (S.Ct.1969) for this proposition; however, these cases are inapplicable.

*Equitable Building and Loan Ass'n v. Davidson,* supra, held that a branch office of a savings and loan could be considered a "property right;" however, that case dealt with a public franchise granted by the state to an association. The reasoning is inappropriate where an agreement between private parties is concerned. *Muckleroy v. Muckleroy,* supra, also dealt with a type of "public franchise." The issue in *Muckleroy* was whether a medical license was "property;" here again the "franchise" in question was a right given by the state to a citizen and therefore is inapplicable to the case at bar. *Muckleroy* states:

Broadly defined, property includes every interest a person may have in a thing that can be the subject of ownership, including the right to enjoy, use, freely possess and transfer that interest. (Citations omitted.)

84 N.M. at 15, 498 P.2d at 1358.

The case then held that although a medical license was a property right, it could not be considered "community property" because it was not subject to joint ownership. The point in *Muckleroy* was that an object of ownership may be property for one purpose but not for another. *People v. Wisch,* supra, is consistent with the *Muckleroy* decision because the court therein held that a milk route that had pecuniary value could be considered "property" which could be the object of an extortion.

■ Here the purported "property right" was the right to distribute Hamm beer. This was a right obtained under an oral agreement between two parties and therefore, a right obtained by a contract. It does not possess the characteristics of a property right because there was no evidence that Southwest could have sold or transferred its interest in the distributorship agreement to another person or corporation and forced Hamm to deal with the transferee. Southwest had the right to order beer from Hamm and to use the Hamm trademarks in selling Hamm products but Southwest had no right to "enjoy, use, freely possess and transfer" the distributorship as a piece of its own property. The only interest Southwest possessed was an oral contract agreement with Hamm.

II. The Encumbrance on Hamm's Assets

■ The district court found as a conclusion of law:

The assets of Theodore Hamm Brewing Company were sold to Respondent with an encumbrance on the assets of said Company as a matter of law and Respondent assumed those assets together with the encumbrance thereon as a matter of law, regardless of the terms of the purchase agreement.

Although there was no express agreement, Olympia may have impliedly assumed this contract through the purchase agreement with Hamm. Therefore, the 64-page purchase agreement must be scrutinized to see if it would support this conclusion.

Olympia agreed to purchase "all of the assets of Hamm utilized by Hamm in connection with the manufacture, sale and distribution of the Hamm's . . . brands of beer . . . and all other items of tangible personal property . . ." This clause was entitled "Acquired Assets" and is followed by four and one-half pages of enumerated items including (h), "Those agreements, undertakings, instruments, executory contracts . . . necessary or desirable for Olympia to use the Acquired Assets to conduct business . . . *all* of which are described on Exhibit A-h . ." (Emphasis added.) Exhibit A-h referred to Collective Bargaining Agreements, advertising contracts, utility and licensing agreements. There was no reference to any distributorship contract. Section 4 related to liabilities and Olympia agreed to "assume, perform, and satisfy the following (*and no other*) liabilities and obligations of Hamm . . ." (Emphasis added.) Again, no distributorship agreement was referred to. Under section 7(c)(i) Hamm represented, warranted and agreed that, "Except for the encumbrances [which were specified] . . Hamm has good and marketable title to all the Acquired Assets free and clear of all mortgages, liens and encumbrances, of every kind and character . . ." Not only did Olympia not assume the distributorship, as a part of the Acquired Assets, but Hamm warranted that those assets would not be subject to any encumbrance.

Southwest also relied on a letter dated April 16, 1975 wherein the Board of Directors of Theodore Hamm Company expressed regret at Olympia's actions in terminating some wholesalers. The directors said, "We believed that by selling to Olympia and Pabst we had substantially accomplished the purpose of Theodore Hamm Company—to assure a supply of *Hamm's* beer for the wholesaler organization, to preserve jobs, and to keep the brands alive."

(Emphasis added.) However, the directors did not contend that there was an agreement or a contract which obligated Olympia to comply with those terms. Despite the language in the purchase agreement the district court held that as a matter of law the assets were encumbered.

■■■ Based upon the findings of fact and the record, there was no support for this conclusion of law. In American jurisdictions it is well settled that a corporation which purchases the assets of another corporation does not automatically acquire the liabilities or obligations of the transferor corporation except (1) where there is an agreement to assume those obligations; (2) where the transfer results in a consolidation or merger; (3) where there is a continuation of the transferor corporation; or (4) where the transfer is for the purpose of fraudulently avoiding liability. *Forest Laboratories, Inc. v. Pillsbury Company,* 452 F.2d 621 (7th Cir. 1971); *Pankey v. Hot Springs Nat. Bank,* 46 N.M. 10, 119 P.2d 636 (1941); 15 W. Fletcher, Cyclopedia of the Law of Private Corporations § 7122 (Rev. perm. ed. 1973). A manufacturer or seller may stop doing business, or refuse to do business with any person or corporation unless such refusal would result in, or is designed to promote, unlawful activity. *United States v. Colgate & Co.,* 250 U.S. 300, 39 S.Ct. 465, 63 L.Ed. 992 (1919); *Joseph E. Seagram & Sons, Inc. v. Hawaiian Oke & Liquors, Ltd.,* 416 F.2d 71 (9th Cir. 1969). None of the exceptions to the general rule are found in the present case.

A case which is strikingly similar to the present situation is *Oak Distributing Co. v. Miller Brewing Company,* 370 F.Supp. 889 (S.D.Mich.1973) wherein the plaintiffs alleged that their distributorships were wrongfully terminated when Miller purchased Meister Brau, Inc. with whom the plaintiffs had had their original distribution agreement. The plaintiffs alleged that Meister Brau had given them assurances "that Meister Brau, Inc. and any corporation acquiring trademarks from it would continue to supply beer products to plain-

tiffs. (No time limit was alleged and no written contract is alleged.)" Supra at 902–903. After Miller assumed control it sent letters to the distributors offering to do business on an order-to-order basis and the plaintiffs had acquiesced by replying to Miller. The court in *Oak Distributing* refused to hold that Miller had impliedly assumed these distributorships when Miller acquired Meister Brau stating:

It is clear that, with respect to a "distributorship", the plaintiffs had nothing to lose. Insofar as Meister Brau sold the rights to market the products in question, plaintiffs may have had an action against Meister Brau. They certainly had no rights against Miller (*supra,* p. 903). Consequently, there 'could have been no duress on the part of Miller, which was merely affording plaintiffs an opportunity to market products which they otherwise would not have had.

Supra at 907–908.

We agree and find that there was no legal encumbrance upon the assets other than those upon which the parties agreed.

III. Termination of the Contractual Agreement

■ The district court also concluded:

That there is a contractual agreement between Petitioner [Southwest] and Theodore Hamm Brewing Company as to the present and future distribution of Hamms Beer by Petitioner which cannot be taken from it by the unilateral actions of Respondent [Olympia] without a showing by Respondent of good faith on its part and a further showing of good cause by Respondent.

This decision was consistent with Southwest's position that since it has sold Hamm beer for 28 years it cannot be terminated no matter what changes occur within the Hamm Company, unless Hamm stops making beer. This contention cannot be supported either factually or legally. A third party (here Olympia) cannot be held liable for the termination of a contract to which it is not a party, particularly after it has timely disclaimed any assumption. On February 28, 1975 Olympia sent a letter to all

the distributors prior to its assuming control of Hamm indicating that it was not taking over the Hamm distribution system and that it planned to "ship the Hamm's brands to you on an order-to-order basis until the evaluation is complete." Olympia clearly indicated that it had not assumed these agreements.

The district court in its findings of fact determined (1) that all distributorship agreements between Southwest and the owners of Hamm were oral; (2) none of the agreements was for a fixed or terminable period of time; and (3) there was no oral or written agreement between Southwest and Olympia giving Southwest the exclusive wholesale distributorship. We accept the findings of the district court. *Gonzales v. Garcia,* 89 N.M. 337, 552 P.2d 468 (1976).

■ Since we have concluded that Olympia did not assume the oral distributorship agreement between Hamm and Southwest by virtue of its acquisition of Hamm's assets, we must determine what relationship between Southwest and Olympia was terminated and if the termination was proper. The district court found that no agreement, either oral or written, existed between Southwest and Olympia; therefore, no contract was formed. *Trujillo v. Glen Falls Insurance Company,* 88 N.M. 279, 540 P.2d 209 (1975). The letter of February 28, 1975 which offered to do business with Southwest on an order-to-order basis could possibly be construed as a distributorship contract, but by trade custom these transactions are generally considered individual contracts of sale. See *Jay-El Beverages, Inc. v. Miller Brewing Company,* 461 F.2d 658 (3d Cir. 1972).

Assuming (without finding any basis in the record) that such a distributorship agreement existed, there was no showing that the termination was unreasonable or that good faith or good cause was necessary. The agreement between Hamm and Southwest was oral and therefore no explicit terms are readily apparent. It seems obvious from the testimony of Mr. Bachechi, Southwest's president, that the termi-

nation of the agreement was never discussed. Mr. Bachechi referred to a "moral understanding" and "ethical behavior" but neither Hamm nor Southwest presented any evidence on whether there was an agreement on the method of termination. The district court also found as a fact that none of the agreements were for any fixed or terminable period of time. Therefore, the next question is whether Olympia's manner of termination was reasonable.

Some courts have held that even though no duration was agreed upon, an exclusive distributorship will extend for a reasonable time or until the dealer has recouped his investment. *Alpha Distrib. Co. of Cal., Inc. v. Jack Daniel Distillery,* 454 F.2d 442 (9th Cir. 1972); *Clausen & Sons, Inc. v. Theo. Hamm Brewing Co.,* 395 F.2d 388 (8th Cir. 1968). Other courts have required reasonable notice of termination. *Des Moines Blue Ribbon Distrib. v. Drewrys Ltd., U.S.A.,* 256 Iowa 899, 129 N.W.2d 731 (1964) (90-day notice reasonable). Some courts have also held that where there is no evidence of an agreement for termination that either party may terminate without cause and without notice. In *Scanlan v. Anheuser-Busch, Inc.,* 388 F.2d 918 (9th Cir.) cert. denied, 391 U.S. 916, 88 S.Ct. 1810, 20 L.Ed.2d 654 (1968), the appellant contended that the distributorship was terminable only for cause. The ninth circuit reversed finding that the evidence showed that the appellee dealt with the distributor only on an order-to-order basis and the agreement was terminable at will. See also *Jay-El Beverages, Inc. v. Miller Brewing Company,* supra. *Robert Porter & Sons, Inc. v. National Distillers Prod. Co.,* 324 F.2d 202 (10th Cir. 1963) involved a factually similar suit wherein the distributor alleged that the appellant wrongfully terminated their 25-year oral distributorship agreement. The appellate court held that the agreement was not a contract and could be terminated at will; therefore, the ninety-day termination notice was not improper.

In the instant case, there was no evidence of a termination provision. From the record it seems clear that the agreement was terminable at will by either party. Southwest had ample opportunity to recoup its initial and subsequent investments and the record shows that Southwest's investments reaped many years of profit. The termination may have been abrupt but Southwest has no legal remedy because it had no right to demand a continuation of the relationship.

IV. Application of Alcohol Beverages Franchise Act

It was this unfortunate state of affairs, resulting mainly from the custom in the liquor business to deal informally and orally, which lead the Legislature to pass the Alcohol Beverages Franchise Act, § 46–9–16 through –20 N.M.S.A. 1953 (Supp.1975). This Act prohibits the above type of activity and imposes the requirement that a "termination, cancellation or failure to renew [must be] done in good faith and for good cause." Section 46–9–17. The district court held that the Franchise Act applied to the relationship between Olympia and Southwest. This was error.

Olympia initially advised Southwest on February 28, 1975 that it was reviewing the distributorships. On April 11, 1975 the Legislature passed the Franchise Act with an emergency clause making it effective immediately; on April 12, 1975 Olympia terminated the distributorship. The relationship between Olympia and Southwest (either as a continuation of the Hamm-Southwest agreement, or on the basis of the order-to-order relationship established by the February 28 letter) would fall within the terms of the Act if the Act applied because § 46–9–16 defines franchise as:

C. . . . a contract or agreement, either expressed or implied, either written or oral, between a supplier and wholesaler, wherein:

(1) a commercial relationship of definite duration, or continuing indefinite duration, is involved; and

(2) the wholesaler is granted the right to offer, sell and distribute within this state or any designated area thereof such of the supplier's brands of packaged distilled

spirits, malt beverages and wines as may be agreed upon;

Olympia contends that to apply the Franchise Act retroactively to relationships existing before the passage of the Act would unconstitutionally impair the obligation of contracts. If the distributorship was a continuation of the Hamm-Southwest agreement, termination was at the will of either party and Olympia properly terminated. If the relationship was order to order, then Olympia terminated before the Franchise Act applied to the Olympia and Southwest transactions.

■ Since the statute makes a substantive change in the rights and obligations of the parties and is remedial in nature, the general rule is that it is presumed to operate prospectively only. *Clark v. Ruidoso-Hondo Valley Hospital,* 72 N.M. 9, 380 P.2d 168 (1963); *Board of Education of City of Las Vegas v. Boarman,* 52 N.M. 382, 199 P.2d 998 (1948); *State v. Padilla,* 78 N.M. 702, 437 P.2d 163 (Ct.App.1968); 2 Sutherland, Statutes and Statutory Construction § 41.04 (Rev. ed. 1973). Although the Act was to take effect immediately, there was no indication that the Legislature intended it to apply retroactively.

In *Superior Motors, Inc. v. Winnebago Industries, Inc.,* 359 F.Supp. 773 (D.S.C. 1973) the federal district court faced an identical problem. It refused to reach the constitutional issue of the validity of newly-enacted franchise termination statute but instead decided that the legislation could not apply to an existing contract, stating:

> [I]t is manifestly clear that this statute, if applied to the instant contract between the parties, would impose significant new duties and conditions and take away previously existing rights. As such, the legislation as applied to this contract would unconstitutionally impair its obligations. The rights of these parties then must be determined without reference to the new legislation.

Supra at 779.

This resulted despite the fact that the termination occurred after the legislation became effective. Cf. *33 Flavors of Florida,*

*Inc. v. Larsen,* 308 So.2d 591 (Fla.App.1975) where the contract was consummated after the legislation was enacted, but the prohibited activity occurred prior; the court held that this was not a retroactive application of the new law nor was the application impairing a contractual obligation.

■ This does not mean that the Franchise Act does not apply to those order-to-order agreements which were in effect prior to April 11, 1975. If a manufacturer was shipping on an order-to-order basis and it shipped an order after April 11, 1975 (which Olympia did not do here) the Franchise Act would apply. If there was a written contract effective before April 11, 1975 then the termination provisions in the contract would control, but any subsequent amendment, renewal or new contract would be subject to the Franchise Act.

■ Having decided that the Franchise Act does not apply, we will not consider at this time the issue of the unconstitutionality of this Act.

Therefore, we reverse the decision and remand this case to the district court to dissolve the injunction and grant judgment in favor of appellant.

IT IS SO ORDERED.

EASLEY and PAYNE, JJ., concur.

SOSA, J., respectfully dissents.

FEDERICI, J., not participating.

SOSA, Justice, dissenting.

I respectfully dissent.

I find merit in the last ground proffered by the trial court in granting the injunction: the distributorship could not be taken from Southwest without Olympia showing good faith and good cause, or more specifically, Olympia violated § 46–9–17, N.M.S.A. 1953 (Supp.1975) of the Alcohol Beverages Franchise Act.

The Theodore Hamm Company's oral contract with Southwest clearly fell within the terms of the Alcohol Beverages Franchise Act. The question is whether Olympia falls within the terms of the Act. I feel that

Olympia, by purchasing Hamm's assets and continuing to supply Hamm's beer on an order-to-order basis, falls within the terms of the Act.

Having found that the Act applies to the relationship between Olympia and Southwest, I now deal with Olympia's arguments that the Act is unconstitutional in that it impairs the obligation of contracts, and violates the due process and equal protection clauses of the New Mexico and United States Constitutions. U.S.Const. art. I, § 10, U.S.Const. amend. XIV; § 1; N.M. Const. art. II, § 19; N.M.Const. art. II, § 18.

Olympia argues that to apply the Act to franchises existing before its enactment would be an impairment of its contractual relationship with Southwest, that is, a new clause would be added to the existing relationship: Olympia could not terminate supplies of Hamm beer to Southwest except for good cause. Olympia cites to various cases holding that the application of such an act to franchise agreements entered into before passage of the act is violative of the impairment of contracts clause. *United States Brewers' Association v. State*, 192 Neb. 328, 220 N.W.2d 544 (1974); *Globe Liquor Co. v. Four Roses Distillers Company*, 281 A.2d 19 (Del.1971), cert. denied, 404 U.S. 873, 92 S.Ct. 103, 30 L.Ed.2d 117; Cf. *Superior Motors, Inc. v. Winnebago Industries, Inc.*, 359 F.Supp. 773 (D.S.Car.1973); Annot., 67 A.L.R.3d 1299. Southwest, on the other hand, argues that the impairment of contracts clause, when balanced against the state's police power to protect the public health, safety, and welfare of its citizens by controlling the distribution of alcoholic beverages pursuant to the broad powers invested in the states by U.S.Const. amend. XXI, see *Seagram & Sons v. Hostetter*, 384 U.S. 35, 86 S.Ct. 1254, 16 L.Ed.2d 336 (1966), must give way. Cf. *California v. LaRue*, 409 U.S. 109, 93 S.Ct. 390, 34 L.Ed.2d 342 (1972); *Ruiz v. Economics Laboratory, Inc.*, 274 F.Supp. 14 (D.C.P.R.1967). I agree.

From its early absolute character, see *Sturges v. Crowninshield*, 17 U.S. (4 Wheat.) 122, 4 L.Ed. 529 (1819), *Dartmouth College v. Woodward*, 17 U.S. (4 Wheat.) 518, 4 L.Ed. 629 (1819), the impairment of contracts clause has been weakened in light of state police powers and has yielded to the right of a state to legislate to protect vital interests of the people. *Home Bldg. & L. Assn. v. Blaisdell*, 290 U.S. 398, 54 S.Ct. 231, 78 L.Ed. 413 (1934); cf. *W. B. Worthen Co. v. Thomas*, 292 U.S. 426, 54 S.Ct. 816, 78 L.Ed. 1344 (1934). One such vital state interest is control of alcoholic beverages. U.S.Const. amend. XXI; *Seagram & Sons v. Hostetter, supra; California v. LaRue, supra*. The test then becomes whether the legislation reasonably protects those interests of a state when balanced against the contractual rights arising between parties. *W. B. Worthen Co. v. Thomas, supra; Home Bldg. & L. Assn. v. Blaisdell, supra*. An examination of the Act is therefore necessary. Section 46–9–17 was added as an additional method of control to the existing three-tier system of controlling the distribution of alcoholic beverages in New Mexico. § 46–5–1 et seq., N.M.S.A. 1953; § 46–9–1 et seq., N.M.S.A. 1953. This three-tier system [1] separates and regulates the sale of alcoholic beverages on the supply, wholesale, and retail levels. Section 46–9–17 seeks to regulate business practices between alcoholic beverage wholesalers and suppliers,[2] in particular it seeks to prevent tied houses and similar means of control by suppliers over wholesalers and, indirectly, over retailers. These direct and indirect means of control are not imaginary. See *Adolph Coors Company v. F.T.C.*, 497 F.2d 1178 (10th Cir. 1974), cert. denied, 419 U.S. 1105, 95 S.Ct. 775, 42 L.Ed.2d 801 (1975). I would hold that the Act is a reasonable exercise of the state's power to regulate the sale and distribution of alcoholic beverages

---

1. For a more detailed study of the three-tier system of control of alcoholic beverages, see F. Switzer, The Three-Tier System of Distribution in the Wine and Spirits Industry (1975).

2. Chapter 325 [1975] N.M. Laws 1878 states in its title: "An Act Regulating Business Practices Between Alcoholic Beverage Wholesalers And Suppliers; Defining Unlawful Acts; Providing for Civil Actions and Penalties; Declaring An Emergency."

and does not unconstitutionally impair the obligation of contracts clause. Thus I would affirm the decision of the trial court.