1997–NMSC–013

933 P.2d 243

**Altagracia G. GARCIA, individually and as personal representative of The Estate of Curtis Garcia, deceased, and as parent on behalf of Alicia Garcia, a minor, Plaintiff–Appellant,**

v.

**The COE MANUFACTURING COMPANY, Defendant–Appellee.**

**No. 23697.**

Supreme Court of New Mexico.

Jan. 28, 1997.

Gaddy & Hall, Philip C. Gaddy, Albuquerque, for Plaintiff–Appellant.

Hatch, Allen & Shepherd, P.A., Gerald G. Dixon, Albuquerque, for Defendant–Appellee.

## OPINION

SERNA, Justice.

{1} Altagracia Garcia, individually and as personal representative of the estate of her husband Curtis Garcia, sued the Coe Manufacturing Company ("Coe") in negligence and strict products liability for wrongful death. The trial court entered summary judgment in favor of Coe, ruling as a matter of law that Coe could not be held liable for injuries caused by a press and forming line manufac-

tured by Coe's predecessor, Washington Iron Works, Inc ("WIW"). The court also ruled that Coe did not have an independent duty to warn of alleged design defects in this equipment. Garcia appealed, and the Court of Appeals certified this case to us.

{2} Under the current New Mexico rule, a successor corporation that purchases the assets of another corporation is, with four exceptions, not responsible for its predecessor's debts and liabilities. However, we today adopt for use in cases involving questions of tort liability an approach that balances the policies underlying products liability law and contract law, and hold that the general rule of nonliability is not controlling in this case. Accordingly, we reverse the summary judgment on Garcia's strict products liability claim and remand for further proceedings. We also hold that a genuine issue of material fact exists as to whether Coe had an independent duty to warn of alleged defects in the equipment. We therefore reverse summary judgment on that issue.

{3} *Facts.* In 1990, Medite was the owner of a fiberboard manufacturing plant outside of Las Vegas, New Mexico. This plant utilized press and forming line equipment [hereinafter "boardline" equipment] manufactured by WIW and purchased by Medite's predecessor, Montana de Fibra, to convert wood chips into medium-density fiberboard. Curtis Garcia was a laborer at the plant and generally worked outside shoveling wood chips; however, on December 17, 1990, he worked inside cleaning up fiber around the forming line, which is an elevated conveyor used to move the chips through the manufacturing process. While the conveyor was stopped for a brief period, Mr. Garcia inadvertently came into contact with it. Upon restarting, the conveyor pulled him underneath a roller, crushing him to death. Montana de Fibra had contracted for the purchase of the boardline equipment in 1982, and WIW was required by the purchase agreement to assist Montana de Fibra in the installation and start-up of the equipment. The installation was not completed until the fall of 1984.

{4} On March 5, 1984, WIW sold to Coe all of its assets relating to the manufacture of boardline plants, equipment, and parts. However, it did not agree to assume any of WIW's debts or liabilities. The sale included patents, trade names, spare parts, design drawings, patterns, jigs, and fixtures, as well as the right to use the name "Washington Iron Works." WIW agreed to indemnify Coe against all claims arising in connection with the boardline plants, equipment, parts, and products manufactured and sold by it prior to March 5, 1984. As part of this indemnification agreement, WIW promised to carry insurance for a period of six years to cover expenses and losses arising from such claims.

{5} Following the sale, Coe mailed a notice to substantially all of WIW's customers, informing them that the latter's boardline division had joined Coe. Penner, who held the position of general manager with WIW and later with Coe, testified that this notice was intended to ensure that WIW customers stayed with Coe and to generate future business. He also testified that Coe wanted WIW's customers to know where they could obtain warranty service on their boardline equipment.

{6} Because installation and start-up of the boardline at the Montana de Fibra plant was in progress at the time Coe acquired WIW's boardline assets, Coe employees assisted in the process. Further, pursuant to a provision of the purchase agreement, Coe also promised to perform all warranty work for which WIW was obligated to its customers. As part of this commitment to Montana de Fibra, Coe rebuilt four loader trays and replaced a cooling unit for the precompressor. However, Coe did not modify, redesign, or refurbish the boardline equipment, and its warranty obligations at the plant expired in January 1985.

{7} After the warranty period expired, Coe employees continued to have contact with Montana de Fibra. Coe sold boardline parts to Montana de Fibra on at least two occasions. Further, Bird, a Coe employee previously employed by WIW, spent two days at the plant in April 1986, inspecting the line equipment and observing the line in operation. Penner, who was also an electrical engineer, observed the boardline in oper-

ation and knew that it was not equipped with a delayed start-up mechanism.[1] He also knew that the start-up switch was located at a point from which both sides of the forming line were not visible to the employee in charge of starting the boardline. Finally, Penner stated that prior to joining WIW he had designed control systems for boardline plants which incorporated delayed start-up mechanisms.

{8} *Proceedings.* Garcia filed her complaint on December 14, 1993, alleging that Coe negligently designed, manufactured, sold, and installed the equipment that caused the death of Curtis Garcia. She also alleged that the equipment was in a defective and unreasonably dangerous condition because it lacked a shield or guard that would have prevented Mr. Garcia from being pulled underneath the roller and because it lacked a delayed start-up mechanism that would have warned him that the line was restarting in time for him to avoid being pulled to his death.

{9} Coe moved for summary judgment, essentially arguing that as a successor it could not be liable for the alleged defects in the equipment and that it had no duty to warn of alleged defects. The trial court granted the motion, holding that as a successor, Coe was shielded from liability and that it had no independent duty to warn. Garcia appealed to the Court of Appeals which in its certification order stated:

> This appeal involves issues of first impression that require a review and reconsideration of Supreme Court holdings in *Southwest Distributing v. Olympia Brewing,* 90 N.M. 502, 565 P.2d 1019 (1977) and *Pankey v. Hot Springs Nat'l Bank,* 46 N.M. 10, 119 P.2d 636 (1941) and whether trends in product liability law require a modification of existing exceptions or additional exceptions to the general rule that a successor corporation is not liable for the liabilities of a transferor corporation.

{10} We accepted certification under Section 34–5–14(C)(2).

{11} *The traditional successorship rule of nonliability for predecessor debts, and the "mere continuation" and "continuing enterprise" exceptions.* When a corporation sells its assets to another corporation, both the seller and the purchaser may identify potential claims and debts against the seller and negotiate the price paid for the assets accordingly. Creditors may be able to obtain recourse from the selling corporation by attaching the proceeds of the sale, and, in the event of the seller's dissolution, statutes generally require satisfaction of creditors' claims before any distribution may be made to the shareholders. *See, e.g.,* NMSA 1978, § 53–16–6(B) (Repl. Pamp.1993) (providing that after filing a statement of intent to dissolve, a corporation shall "pay, satisfy and discharge its liabilities ... [and shall] distribute the remainder of its assets, either in cash or in kind, among its shareholders.") For these reasons, among others, the traditional rule evolved that a cash sale of assets is insufficient to impose responsibility on a successor corporation for the debts and liabilities of its predecessor. Stated otherwise, the successor corporation will not be liable for the predecessor's debts in the absence of a contractual provision assuming these obligations. *See Southwest Distributing Co. v. Olympia Brewing Co.,* 90 N.M. 502, 505, 565 P.2d 1019, 1022 (1977). Also important in the development of this rule was the desire to promote economic development by facilitating the free alienability of corporate assets. The courts therefore applied a rule of property law that a purchaser who gives adequate consideration without notice of prior claims against the property takes free of such claims. Janet B. Fierman, *Assumption of Products Liability in Corporate Acquisitions,* 55 B.U.L.Rev. 86, 93 (1975).

{12} This Court first adopted the general rule of nonliability and its four traditional exceptions in *Pankey v. Hot Springs Nat'l Bank,* 46 N.M. 10, 16, 119 P.2d 636, 640 (1941). There, we considered whether a judgment creditor of a predecessor bank

---

1. This is a mechanism that would have emitted audible and visible warnings prior to restarting of the conveyor.

could levy on the assets of the successor bank where "ledger liabilities" had been assumed. *Id.* While the president, a cashier, and the board of directors of both banks were identical, we prohibited the levy, reasoning that the judgment which furnished the basis for the levy was not a "ledger liability." *Id.* Similarly, in *Southwest Distributing*, we concluded that a successor brewing company which had acquired all the assets of its predecessor did not assume the obligation to perform an oral distributorship agreement entered into by its predecessor. 90 N.M. at 505–06, 565 P.2d at 1022–23. We also noted the four traditional exceptions to application of the rule precluding liability: "(1) where there is an agreement to assume those obligations; (2) where the transfer results in a consolidation or merger; (3) where there is a continuation of the transferor corporation; or (4) where the transfer is for the purpose of fraudulently avoiding liability." *Id.* at 505, 565 P.2d at 1022. We have not had the opportunity to analyze the application of the rule and its exceptions in the context of a tort claim against a successor corporation. Clearly, the only arguable exception that might be applicable is the third exception—a continuation of the transferor or predecessor corporation.

▆▆▆ {13} Garcia argues that the evidence showed that Coe was a "mere continuation" of WIW, and therefore, her complaint should not have been dismissed. Generally, a continuation of the transferor corporation occurs where there is (1) a continuity of directors, officers, and shareholders; (2) continued existence of only one corporation after sale of the assets; and (3) inadequate consideration for the sale of the assets. *McCarthy v. Litton Indus.*, 410 Mass. 15, 23, 570 N.E.2d 1008, 1013 (1991). The "key element of a 'continuation' is a common identity of officers, directors and stockholders in the selling and purchasing corporations." *Leannais v. Cincinnati, Inc.*, 565 F.2d 437, 440 (7th Cir.1977). Thus, the mere continuation exception "has no application without proof of continuity of management and ownership between the predecessor and successor corporations." *Pancratz v. Monsanto Co.*, 547 N.W.2d 198, 201 (Iowa 1996). In this case, WIW and Coe did not share directors, offi-

cers or stockholders; therefore, Coe is not liable to Garcia under the mere continuation exception.

{14} Garcia alternatively asks that if we hold the "mere continuation" exception does not apply here, we adopt and apply the "continuing enterprise" exception. Under this exception, various factors are considered, such as whether the successor utilizes the same production and supervisory personnel, the same corporate officers and directors, the same managerial personnel, the same methods of production, and the same name. Thus, "[A] continuation of enterprise analysis seeks to establish whether there is a substantial continuity of pretransaction and posttransaction business activities resulting from the use of the acquired assets" to impose liability in the absence of a continuation of ownership. 1 Timothy E. Travers et al., *American Law of Products Liability* § 7:20, at 37 (3d ed. 1994); *see also Cyr v. B. Offen & Co.*, 501 F.2d 1145 (1st Cir.1974); *Turner v. Bituminous Casualty Co.*, 397 Mich. 406, 244 N.W.2d 873 (1976).

{15} The basis for the continuation of enterprise exception is largely one of public or social policy under which it has been determined that, irrespective of fault, a party should be held responsible for the acts of another. *American Law of Products Liability, supra,* § 7:21, at 37. In the event we do not adopt the continuing enterprise exception, Garcia asks this Court to adopt the "product-line" exception, which "seeks to establish whether there is a substantial continuity in the *products* resulting from the pretransaction and posttransaction use of the [predecessor's] assets." *American Law of Products Liability, supra,* § 7:20 at 37. We believe the rationale underlying both exceptions is the necessity of protecting an injured person who may be left without a remedy if the predecessor has dissolved, is defunct, or is otherwise unavailable to respond in damages. *See Turner,* 244 N.W.2d at 878. Whether this important policy consideration prevails depends on a judgment made after assessing the competing policies which underlie rules of contract and tort liability consistent with products liability analysis previously established by this Court. *See Brooks*

*v. Beech Aircraft Corp.,* 120 N.M. 372, 377, 902 P.2d 54, 59 (1995) (holding that decision whether to apply strict liability principles to design defect claims depends upon a balancing of conflicting policy considerations); *cf. Turner,* 244 N.W.2d at 877 (stating that rules of law relevant to other issues such as privity and limitations of actions may not be appropriate in products liability analysis).

{16} ***Balancing the competing interests of the predecessor, successor, and injured person results in the adoption of the product-line exception.*** In *Brooks,* this Court considered whether to assess liability for injuries caused or enhanced by a design defect under the doctrine of strict products liability. We determined that such a decision required a balancing of competing policy considerations. On behalf of the injured person, we examined the onerous burden of proving negligence, the fairness in imposing the loss on the manufacturer who profited by placing the defective product in commerce, and the availability of chain of supply protection. On the other hand, we acknowledged the increased exposure of the manufacturer under strict liability principles given the conduct-dependent nature of design decisions. We also acknowledged the risk that the public could be deprived of useful and beneficial products and that manufacturers could suffer unfair consequences of generational changes in technology and attitudes about safety because of this increased exposure. *Brooks,* 120 N.M. at 375–77, 902 P.2d at 57–59. A similar balancing analysis is required here.

{17} When a successor corporation continues to market many of the same products and represents to the public and its predecessor's customers that it is continuing the predecessor's enterprise, it essentially picks up where the predecessor left off. Whether liability should be imposed depends on whether the successor has the same ability as its predecessor to assess, control, and distribute the risks and costs of injuries caused by a product defect. If it does, we must still determine whether under the facts of a particular case this ability is nevertheless outweighed by the policies underlying the contract-law-based rule of successor corporation nonliability—chiefly, promoting the

alienability of corporate assets. *See Cyr,* 501 F.2d at 1153; *Ray v. Alad Corp.,* 19 Cal.3d 22, 136 Cal.Rptr. 574, 580–82, 560 P.2d 3, 9–11 (1977); *see also* Dale A. Stalf, Comment, *A Search for the Outer Limits to Successor Corporation Liability for Defective Products of Predecessors,* 51 U.Cin.L.Rev. 117, 126–30 (1982).

{18} In *Ray,* the California Supreme Court considered whether to impose liability on a successor that had acquired the plant, equipment, inventory, trade name and goodwill of a ladder manufacturer which continued to manufacture the same line of ladders. *Ray,* 136 Cal.Rptr. at 575–77, 560 P.2d at 4–5. In rejecting the general rule of nonliability, the court relied on the following policy considerations: (1) the unavailability of any other remedy to the plaintiff because of the predecessor corporation's liquidation, which was triggered by the successor's asset purchase; (2) the availability of information and knowledge to the successor necessary to assess the risks posed to consumers of previously manufactured ladders and the ability to pass on to current and potential customers the costs associated with those risks; and (3) the fact that while the predecessor's goodwill did enhance sales, it remained strictly liable for injury caused by defectively-produced ladders. *Id.* 136 Cal.Rptr. at 580–81, 560 P.2d at 9. For these reasons, the court concluded that the successor had assumed strict products liability for defects in ladders of the same product line previously manufactured by the predecessor. *Id.* 136 Cal.Rptr. at 582, 560 P.2d at 11.

{19} New Jersey followed California's lead in *Ramirez v. Amsted Indus.,* 86 N.J. 332, 431 A.2d 811 (1981). There, the court considered whether to impose liability on a successor corporation when the agreement memorializing the sale of corporate assets expressly disclaimed any assumption by the successor of liability for contingent product defect claims. *Id.* 431 A.2d at 812. Noting that New Jersey had "long-recognized the significance of the social policy of risk-spreading in establishing the manufacturer's duty to the product user under the rapidly expanding principles of strict liability in tort," the New Jersey court concluded that

the focus in such cases should be on "the successor's continuation of the actual manufacturing operation and not on commonality of ownership and management between the predecessor's and successor's corporate entities ..." *Id.* at 819–20. While the New Jersey court rejected *Cyr's* expansion of the mere continuation exception and instead adopted the product-line exception, the principles of enterprise liability upon which the New Jersey court relied were drawn in part from *Cyr* as follows:

> The very existence of strict liability for manufacturers implies a basic judgment that the hazards of predicting and insuring for risk from defective products are better borne by the manufacturer than by the consumer. The manufacturer's successor, carrying over the experience and expertise of the manufacturer, is likewise in a better position than the consumer to gauge the risks and the costs of meeting them. *The successor knows the product, is as able to calculate the risk of defects as the predecessor, is in position to insure therefor and reflect such cost in sale negotiations, and is the only entity capable of improving the quality of the product.*

*Ramirez*, 431 A.2d at 817 (quoting *Cyr*, 501 F.2d at 1154) (emphasis added). Further, the New Jersey court noted, "that having received the substantial benefits of the continuing manufacturing enterprise, the successor corporation should also be made to bear the burden of the operating costs that other established business operations must ordinarily bear." *Id.* 431 A.2d at 822.

{20} We note that both the continuing enterprise and product-line exceptions have been rejected by many courts that have considered them. *See American Law of Products Liability, supra,* § 7:27, at 44. Courts have criticized the exceptions on several fronts. *See Downtowner, Inc. v. Acrometal Prod., Inc.,* 347 N.W.2d 118, 123 (N.D.1984) (stating that because successor did not design or manufacture the product, it has no connection with the risk posed by the product and therefore owes no duty); *Johnston v. Amsted Indus., Inc.,* 830 P.2d 1141, 1144 (Colo.Ct.App.1992) (stating that no duty arose because successor didn't solicit the use of the defective product or make any representations as to its safety); *Jones v. Johnson Mach. & Press Co.,* 211 Neb. 724, 320 N.W.2d 481, 484 (1982) (same); *see also Guzman v. MRM/Elgin,* 409 Mass. 563, 567 N.E.2d 929 (1991) (stating that goodwill purchased from predecessor did not result in a benefit to successor as a matter of course); *Manh Hung Nguyen v. Johnson Mach. & Press Corp.,* 104 Ill.App.3d 1141, 60 Ill.Dec. 866, 873, 433 N.E.2d 1104, 1111 (1982) (finding it problematic whether successor, especially small entrepreneur, can spread the costs); A. Schiff, *Products Liability and Successor Corporations: Protecting the Product User and the Small Manufacturer Through Increased Availability of Products Liability Insurance,* 13 U.C.D.L.Rev. 1000, 1003 (1980) (noting that most small companies are unable to obtain policies covering liability for injuries caused by a predecessor's products).

{21} We believe, however, that these concerns may be allayed by application of the principles established in *Ray* and *Brooks,* and we therefore adopt the product-line exception. We have long held that control over the design and manufacturing process of a particular product is not a requirement for strict products liability. *See, e.g., Stang v. Hertz Corp.,* 83 N.M. 730, 733, 497 P.2d 732, 735 (1972) (holding the lessor of an automobile strictly liable for the death of passenger killed when a defective tire caused crash). The "knowledge of risk" consideration of *Ray* remedies the duty issue posed by *Downtowner* and similar cases. In short, the successor is positioned to assess the risks before purchasing the assets, and to then decide whether to assume the potential burden associated with its acceptance of the predecessor's goodwill by continuing to produce the same product line.

{22} In *Brooks* we rejected the argument that liability for injuries caused by product design defects should be limited to negligence. We reasoned that "[a]s long as the price of a defective product line or *successive* product lines reflect some element of injury costs, the [strict liability] policy goal of cost distribution has been served." 120 N.M. at 378, 902 P.2d at 60 (emphasis added). Be-

cause "strict liability focuses on the *product,*" and not on *conduct,* it is not unfair to assess liability to successor manufacturers who have purchased the right to benefit from selling and servicing that product. *Id.* When, as here, the successor continues to produce and market the same product, using the same designs, equipment, and name, the successor stands in a comparable position to the predecessor in terms of its ability to assess the risk of injury posed by the product. Further, because it continues to market the same product, it can adjust the price to reflect its risk assessment. Finally, when, as here, the successor corporation succeeds to a position of market prominence because of the goodwill developed by the predecessor, it is not unfair for the successor to assume the potential burden of responding in damages. Although it is true that Coe may suffer a loss in goodwill as a result of the injury produced by the forming line, applying the *Ray* analysis to Coe serves the policies of strict products liability expressed in *Brooks* and other strict products liability cases. Moreover, under the facts of this case the policy considerations supporting the imposition of strict products liability are not outweighed by those applicable to the general rule of successor nonliability. In this regard we echo the observations of the First Circuit in *Cyr:*

> [T]he dictates of freedom of business decision are less compelling when an ongoing business assumes all other benefits and liabilities of its predecessor, holds itself out to the world as the same enterprise, without notifying known customers, [and] continues to function in the same manner … with the same key employees, producing the same product.

501 F.2d at 1153. To these observations we add that, despite Coe's protestations to the contrary, it was able to insure itself against being ultimately liable for claims such as Garcia's by negotiating insurance and indemnification provisions as part of the purchase agreement with WIW. Simply because the six-year period for which it negotiated may have been too short does not lead to the conclusion that the alienability of corporate assets will be harmed.

{23} Having adopted the product-line exception and having determined that there may be genuine issues of material fact affecting its application, we reverse the summary judgment dismissing Garcia's strict liability claim.

{24} ***There was a genuine issue of material fact as to whether Coe breached an independent duty to warn of alleged defects in the boardline.*** A corporation that acquires the assets of another for adequate cash consideration does not automatically acquire a duty to warn of alleged defects in its predecessor's products. Such a duty arises only when there is a nexus between the successor corporation, its predecessor's customers, and the allegedly defective product. The key inquiry is whether there are sufficient facts to warrant an inference that the successor corporation had actual or constructive notice of the alleged defect. *See Serna v. Roche Lab.,* 101 N.M. 522, 524, 684 P.2d 1187, 1189 (Ct.App.1984) (stating that when dangers from use may be anticipated, manufacturer must provide adequate warning or the product is "defective", citing *Restatement (Second) of Torts,* § 402A cmt. h).

{25} In *Travis v. Harris Corp.,* 565 F.2d 443, 449 (7th Cir.1977), the Seventh Circuit stated that

> [s]uccession to a predecessor's service contracts, coverage of the particular machine under a service contract, service of that machine by the purchaser corporation, a purchaser corporation's knowledge of defects and of the location or owner of that machine, are factors which may be considered in determining the presence of a nexus or relationship effective to create a duty to warn.

The court cautioned, however, that "[t]he mere continuation of a name and acquisition of good will cannot of themselves create a duty to warn." *Id.* at 448. Rather, "a duty to warn arises when a relationship exists between him upon whom the duty falls and the dangerous situation to be warned against." *Id.*

{26} New York's highest court has held that a successor may be held liable for breaching an independent duty to warn of defects in its predecessor's products. *Schu-*

*macher v. Richards Shear Co.,* 59 N.Y.2d 239, 464 N.Y.S.2d 437, 440–41, 451 N.E.2d 195, 199 (1983). New York adopted the list of factors set out in *Travis* as the relevant considerations in determining whether a duty to warn exists. *Id.* Applying these considerations in *Schumacher,* the court held that there was sufficient evidence to defeat a motion for summary judgment on the issue of failure to warn, stating:

> Other than the single service call (which, standing alone, might not be enough to create a duty to warn), [the successor] knew of the location and owner of the machine and actively offered to service it. Moreover, [the successor] held itself out on at least two occasions as having expertise in the product line it had acquired from [its predecessor]. Although [the successor] apparently did not formally assume [its predecessor's] service contracts, it did, in fact, offer to service the machine to the potential economic advantage of both parties.

464 N.Y.S.2d at 442, 451 N.E.2d at 200.

{27} Here, the record discloses that Coe did more than merely continue WIW's name and acquire its good will. Moreover, its relationship with Montana de Fibra consisted of more than "a single service call." Under the purchase agreement, Coe assumed WIW's service contract obligations. Coe knew that a WIW boardline was in operation at the Montana de Fibra plant. Coe's employee made a service call to the plant, and its employees observed the line in operation. Penner was familiar with delayed start-up mechanisms and knew the boardline at the Montana de Fibra plant did not have such a mechanism. Finally, Coe participated in the installation and start-up of the boardline at the Montana de Fibra plant and performed at least two items of warranty work thereon. Therefore, even though the president of Coe stated in his affidavit that Coe was not aware of any *accidents* involving similar boardline equipment, viewing the facts in a light most favorable to Garcia, this evidence was sufficient to create an issue of fact whether Coe breached its duty to warn of potential safety hazards. Accordingly, we reverse the summary judgment regarding Garcia's negli-

gence claim and remand for further proceedings consistent with this opinion.

**IT IS SO ORDERED.**

{28}

FRANCHINI, C.J., and BACA, J., concur.

